# In the United States Court of Federal Claims

No. 23-361
(Filed Under Seal: May 26, 2023)
(Reissued for Publication: June 23, 2023)[1]

```
*****************************************
SAMSARA INC.,                          *
                                       *
              Plaintiff,               *
                                       *
      v.                               *
                                       *
THE UNITED STATES,                     *
                                       *
              Defendant,               *
                                       *
 and                                   *
                                       *
GEOTAB USA, INC.,                      *
                                       *
              Defendant-Intervenor.    *
*****************************************
```

Bid Protest; Motion for
Preliminary Injunction;
Likelihood of Success on the
Merits; Organizational Conflicts
of Interest; Incumbent
Advantage; Irreparable Harm.

*John E. McCarthy, Jr.*, Crowell & Moring LLP, Washington, DC, counsel for Plaintiff. With whom were *Zachary H. Schroeder* and *Issac D. Schabes*, of counsel.

*Kara M. Westercamp*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. *Wendy Harris*, Commercial and Appellate Litigation Law Department, U.S. Postal Service.

*Robert Nichols*, Nichols Liu LLP, Washington, DC, counsel for Defendant-Intervenor. With whom were *Michael Bhargava*, *Sam Van Kopp*, and *Madison Plummer*, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

Before the Court is a motion filed by Samsara, Inc. ("Samsara") requesting a preliminary injunction enjoining the United States Postal Service ("USPS") from proceeding with performance of its contract with Geotab USA, Inc. ("Geotab") for the procurement of a

---

[1] This Opinion and Order was filed under seal on May 26, 2023, *see* [ECF 37], in accordance with the Protective Order entered on March 20, 2023, *see* [ECF 13]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on June 20, 2023, with an agreed upon proposed redaction. [ECF 40]. The Court accepts the parties' proposed redaction. The redaction is indicated by bracket asterisks, *e.g.*, "[* * *]."

telematics system for USPS vehicles. Because the Court finds that Samsara has not demonstrated that it is entitled to injunctive relief, Samsara's motion is **DENIED**.

## I.     BACKGROUND

Samsara's bid protest relates to a procurement of telematic devices by the USPS for installation into its vehicle fleet. *See* AR 1875.[2] The USPS operates a fleet of over 230,000 vehicles that fall into three categories: (1) delivery vehicles, such as the Grumman Long Life Vehicles ("LLV"); (2) logistics vehicles consisting of tractors, trailers, and cargo vans; and (3) non-mail hauling vehicles used for administrative and maintenance support. *Id.* The USPS intends to use telematic devices to "monitor the health and locations of the vehicles." *Id.* The telematic devices "will inform drivers of safety warnings, provide fuel savings (through driver behavior modification and enhanced maintenance), and provide vehicle health details" for maintenance purposes. *Id.* The telematic devices "plug[] into a vehicle's data port . . . and provide[] near real-time information on the operating condition of the vehicle—mileage, location, acceleration/deceleration, battery condition, fluid levels, tire pressure . . ., etc." *Id.* The USPS fleet includes heavy duty vehicles, medium/light duty vehicles, light duty vehicles, and trailers. AR 1878-79. The heavy duty and medium/light duty vehicles have On Board Diagnostic 2 ("OBDII") data ports, and the light duty vehicles, which include the LLVs, have On Board Diagnostic 1 ("OBDI") data ports. *Id.*

The USPS issued a pre-solicitation Request for Information ("RFI") on December 22, 2021, seeking to assess product availability and interface compatibility with different USPS vehicle types (including OBDI and OBDII data ports). AR 8-9. The RFI included a Statement of Work ("SOW") for the engineering, design, and installation of telematics devices for the USPS vehicles. AR 18. The RFI required that the supplier "have demonstrated success transmitting engine diagnostic trouble codes and vehicle performance from vehicles with OBDI ports, preferably General Motors (GM) vehicles, specifically the Chevy S10 (model years '87-'94)" and that the supplier's telematics device and supporting software be FedRAMP certified. AR 9, 11. Further, the RFI stated that the USPS would assign a score to each of the supplier responses, rank them based on their respective qualifications, and place the most qualified suppliers on a prequalified list. AR 11.

After evaluating the supplier's responses, the USPS determined that ten suppliers satisfied the RFI's pre-qualification requirements and, thus, were added to the prequalified list. AR 36-37. The USPS included Samsara, Geotab, and [* * * * * *] on that list. *Id.* On August 1, 2022, the USPS sent a request for proposal to the suppliers on the prequalified list. AR 54. The solicitation contemplated the award of an indefinite delivery, indefinite quantity ("IDIQ") contract for a minimum of 2,000 telematic devices and a maximum of 315,000 telematic devices with a maximum performance period of nine years. *See* AR 55-56. The solicitation required

---

[2] The government initially filed the administrative record on March 29, 2023. [ECF 27]. Subsequently, the government moved to correct the administrative record with "documents related to the agency's request for revised pricing proposals and the responses[,]" Def.'s Mot. for Leave to Correct Admin. R. [ECF 28], which the Court granted, Order [ECF 29]. The government then filed a complete administrative record on April 3, 2023. [ECF 30]. The Court cites to the complete administrative record, filed by the government at [ECF 30-1, 30-2, 30-3] as "AR ___."

suppliers to provide both technical and price proposals. AR 56. It also required suppliers to complete a SOW compliance matrix and a pricing template. *Id*.

Regarding technical proposals, the solicitation stated that suppliers "should present sufficient information to reflect a thorough understanding of USPS objectives and requirements and a detailed plan for achieving the objectives of the scope of work" and that "proposals shall not merely paraphrase the requirements of the USPS' scope of work . . . or use phrases such as 'will comply' or 'standard techniques will be employed.'" AR 130. The solicitation provided that the USPS would evaluate each technical proposal according to three criteria: telematic solution, supplier capability, and past performance. AR 137. Regarding price proposals, the solicitation provided that the USPS would evaluate the price elements in the pricing template to determine fairness and reasonableness. AR 138. The solicitation further provided that the USPS would not adjectivally rate price proposals but would "determine that the proposed pricing [was] fair and reasonable through historical data, market factors, or competition." *Id*. Additionally, the solicitation stated that the USPS would evaluate proposed pricing "over the total anticipated period of performance (base and all options)." *Id*.

For each criterion, the solicitation stated that the USPS would evaluate each proposal to determine its strengths, weaknesses, and risks and then assign it an adjectival rating of unacceptable, poor, fair, good, very good, or excellent. AR 137-38. The solicitation provided that the USPS would then select the proposal that represents the best value for contract award. AR 136. To determine which proposal represents the best value, the solicitation stated that "technical factors are considered more important than price." *Id*. (emphasis omitted). It further stated that, "[a]lthough price will be considered in the award decision, the award may not necessarily be made to the supplier submitting the lowest price" and that "[t]he USPS will not make an award for a significantly higher priced proposal unless its technical rating indicates a relatively proportionate higher technical performance." *Id*. Additionally, the solicitation noted that "[a]s the ratings for the technical factors among [o]fferors become more equivalent, then cost or price will become an increasingly significant factor in the [USPS's] best value decision." *Id*.

The solicitation indicated that the USPS would utilize two teams to evaluate proposals, a technical evaluation committee ("TEC") and a price/business evaluation team ("PET"). AR 136. The solicitation provided that the TEC would evaluate and score the technical proposals based upon a consensus, and the PET would conduct the initial analysis of the business proposals, including price. *Id*. The solicitation also provided that the TEC and PET would have the option to request clarifications or conduct discussions. *Id*. It further provided that the TEC and PET would ultimately combine into a "Purchase Team" to rank the proposals based on technical and price merit, conduct negotiations and further discussions, and recommend which proposal represents the overall best value. *Id*. The Contracting Officer ("CO") would consider the Purchase Team's recommendation when making the award decision. *Id*.

The USPS received eight proposals, including those from Samsara, Geotab, and [* * * * * * * * *]. *See* AR 3105. Following the technical evaluation, Geotab received the highest technical score at 95.5. AR 3195. Samsara tied with [* * * * * * *] for the second highest technical score at 83.0. *Id*. The USPS then held price negotiations with Samsara, Geotab, and [* * * * * * *]because they received the highest technical scores and had the best chance of

providing the USPS with the best value. AR 3195. While all three suppliers were determined to be within the reasonable price range, the CO provided them with an opportunity to submit revised pricing to improve their proposed prices and clarify certain costs. AR 3196. Samsara was the only offeror that did not propose a reduced price. *Id.* Based on the evaluation results, the suppliers were ranked as follows:

| Offeror | Technical/Risk Score | Evaluated Price |
|---------|---------------------|-----------------|
| Geotab | 95.5 | $281,810,863 |
| Samsara | 83.0 | [* * *] |
| [* * *] | 83.0 | [* * *] |

AR 4069;[3] *accord* AR 3195-96. Based on these ratings, the CO selected Geotab for contract award as the best value. AR 3199, 3453. The CO explained that "[t]he technical proposal offered by Geotab is rated the highest technically" and "[w]ith regards to price, the margin of difference is small between Geotab and the other two suppliers, suggesting the price as offered by Geotab is fair and reasonable in comparison to the market pricing." AR 3199-3200. Accordingly, the CO concluded that "[i]n light of Geotab's technical superiority, its fair and reasonable price offerings suggest it is the best value offeror to the [USPS]." AR 3200.

The USPS awarded the contract to Geotab on November 17, 2022. AR 3453. Following a post-award debriefing, AR 526-27, Samsara submitted an agency-level protest to the CO on December 12, 2022. *See* AR 3528-62. The CO denied Samsara's protest on December 22, 2022. AR 3745-56. Samsara subsequently appealed the CO's decision to a Supplier Disagreement Resolution Officer ("SDRO"). AR 3757-3803. On March 8, 2022, the SDRO also denied Samsara's protest. AR 4056-72.

Samsara filed its bid protest in this Court on March 13, 2023, alleging that the USPS's decision to award the contract to Geotab was arbitrary, capricious, and contrary to law and applicable regulations. Compl. [ECF 1]. Geotab intervened on March 15, 2023. *See* Mot. to Intervene [ECF 10]. During the initial status conference, the government stated that the USPS did not agree to voluntarily stay performance of its contract with Geotab. On April 3, 2023, Samsara filed a motion seeking a preliminary injunction. Pl.'s Mot. for Prelim. Inj. [ECF 31]. Samsara's motion is fully briefed, and the Court held oral argument on April 12, 2023. [ECF 12].

## II. DISCUSSION

Samsara requests that the Court enter a preliminary injunction enjoining the USPS from continuing performance of its contract with Geotab during the pendency of its protest. *See* [ECF 31]. The Tucker Act grants this Court authority in bid protests to award any relief it considers proper, including injunctive relief. *See* 28 U.S.C. § 1491(b)(2). However, injunctive relief "may only be awarded upon a clear showing that plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). When determining whether to grant a preliminary injunction, the Court considers: (1) whether the movant has a reasonable likelihood of success on the merits, (2) whether the movant will suffer irreparable harm if an injunction is not granted, (3)

---

[3] This table was modified to reflect only the offerors relevant to this protest.

whether the balance of hardships tips in the movant's favor, and (4) whether the public interest is best served by an injunction. *See id.; see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). While no one factor is dispositive, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned to the other factors, to justify the denial." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). The burden of demonstrating entitlement to an injunction is on the movant. *Id.* Additionally, "a movant *must* establish the existence of both of the first two factors to be entitled to a preliminary injunction." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (emphasis added). For the reasons explained below, the Court finds that Samsara is not entitled to injunctive relief because it has not demonstrated that it is likely to succeed on the merits of its bid protest and has not shown that it will be irreparably harmed absent injunctive relief.

### A.     Likelihood of Success on the Merits

To satisfy the likelihood of success on the merits factor, Samsara must show that it is "more likely than not" to succeed in its protest of the USPS's award to Geotab. *See Revision Mil., Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012); *see also Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). This court reviews bid protests using the standard of review set forth in the Administrative Procedure Act ("APA"), *see* 28 U.S.C. § 1491(b)(4), which permits the court to set aside an agency's contracting decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2018); *see Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1080 (Fed. Cir. 2001).The court may set aside a bid protest award if "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States,* 953 F.3d 1373, 1377 (Fed. Cir. 2020). The "arbitrary or capricious standard . . . is highly deferential" to the agency's decision and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A protestor "bears a *heavy burden* of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (cleaned up) (emphasis added). In addition to showing that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, the protestor also must show that it was prejudiced by the government's action to prevail in a bid protest. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). To establish prejudice, the protestor must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. United States*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).

In its motion, Samsara argues that it is more likely than not to succeed in its protest of the USPS's award to Geotab because the USPS failed to mitigate organizational conflicts of interest ("OCI") that gave Geotab an unfair competitive advantage, the USPS's evaluation of its technical and price proposals was arbitrary and capricious, and the USPS conducted a flawed best value determination. The Court finds that Samsara is not likely to succeed on the merits of its challenges.

1.    <u>**Samsara's Assertion that the USPS Failed to Mitigate OCIs**</u>

Samsara argues that the USPS "disregarded significant conflicts and unfair competitive advantages in awarding the contract to Geotab stemming from Geotab's participation in a proof-of-concept pilot program with the USPS . . . from 2019-2021." [ECF 31] at 13.[4] Samsara argues that the "pilot program afforded Geotab unique access to the Grumman LLV—the only USPS vehicle with OBD-I capabilities." *Id*. at 13-14. Additionally, Samsara argues that "three key [USPS] stakeholders on the Geotab proof of concept pilot program drafted the solicitation requirements and served on the seven-member USPS [t]echnical [e]valuation [c]ommittee." *Id*. at 14. Samsara contends that the USPS failed to conduct a reasonable investigation or implement reasonable mitigation measures to address these OCIs. *Id*. The Court finds that Samsara is not likely to succeed in its argument that the USPS disregarded OCIs.

The USPS purchasing regulations do not address OCIs. *See generally* 39 U.S.C. § 601. However, the USPS Supplying Principles and Practices ("SP&P")[5] provide:

> An [OCI] exists when the nature of the work to be performed under a contract may give an offeror or supplier an unfair competitive advantage and when an offeror or supplier has other interests that may impair its objectivity or ability to render impartial assistance or advice or to provide objectivity in performing the contract work.

SP&P 7-15.2. The SP&P further provide:

> As part of purchase planning . . . contracting officers, with the assistance of the purchase/SCM team, must attempt to identify organizational conflicts of interest so that they may be avoided, neutralized or mitigated . . . . When a potential organizational conflict is foreseeable, the contracting officer should consult with assigned counsel and obtain the assistance of appropriate technical specialists to consider the potential to avoid, neutralize or mitigate the [OCI]. Mitigation actions may include, but are not limited to (a) developing a solicitation provision restricting competition to offerors without conflicts of interest, (b) including a contract clause limiting the supplier's eligibility for future contracts and subcontracts, and (c) the adoption of other measures to ensure as fair

---

[4] All page numbers in the parties' filings refer to the page numbers generated by the CM/ECF system.

[5] USPS procurements are exempt from the requirements of the Federal Acquisition Regulation ("FAR") and the Competition in Contracting Act. 39 U.S.C. § 410. Instead, the USPS's Purchasing Regulations "apply to all Postal Service acquisition of property (except real property) and services." 39 C.F.R. § 601.103; *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1349 n.1 (Fed. Cir. 2004) (stating that the predecessor to the Purchasing Regulations, "not the [FAR], applies to USPS procurements."). The USPS developed the SP&P to "supplement the Postal Service's purchasing regulations." U.S. Postal Serv. Supplying Principles and Practices, Introduction. The SP&P, however, "are not binding regulations of the Postal Service." SP&P, General Overview of the U.S Post. Serv. Supplying Principles.

a competition as possible. Any limit on future contracts must be for
a reasonable period sufficient to avoid unfair competitive advantage
or potential bias.

SP&P 7-15.2.1. The USPS SP&P do not constitute binding regulations; however, the Court may
review whether the USPS's actions in its handling of a potential OCI lacked a rational basis in
light of the SP&Ps guidance. *See Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl.
248, 266 (2021) (citing *Impresa*, 564 F.3d at 1332). Under the SP&P, the CO is tasked with
identifying, neutralizing, and mitigating OCIs, SP&P 7-15.2, and the Court will not interfere
with the CO's exercise of discretion in handling an OCI unless the CO's actions were arbitrary,
capricious, or otherwise contrary to law. *See PAI Corp. v. United States*, 614 F.3d 1347, 1352
(Fed. Cir. 2010). "Contracting officers are not obligated by the APA to provide written
explanations for their actions," and agency decisions are "entitled to a presumption of
regularity." *Impresa*, 238 F.3d at 1337-38. When evaluating OCI mitigation efforts, "government
officials are presumed to do their duty, and one who contends they have not done so must
establish that defect by clear evidence." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374,
1384 (Fed. Cir. 2009) (quoting *Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402
F.3d 1345, 1350 (Fed. Cir. 2005)). Accordingly, to demonstrate that an OCI determination is
arbitrary or capricious, a protestor must identify "hard facts" and "a mere inference or suspicion
of an actual or apparent conflict is not enough." *PAI Corp. v. United States*, 614 F.3d at 1352;
*accord Turner Const. Co. v. United States*, 645 F.3d 1377, 1385 (Fed. Cir. 2011).

a.   Samsara's Assertion that Geotab had Unequal Access to LLVs

The solicitation required that suppliers provide a "distinct version of [t]elematic devices"
for "Light Duty OBDI vehicles: the Grumman Long Life Vehicle (LLV) with an OBDI
connector specific to a Chevrolet S-10 1987-1994 model years." AR 1882. Prior to the
solicitation and the pre-solicitation RFI, Geotab participated in a pilot program from December
2019 to December 2020 during which it worked with "older LLVs, which use the OBD-I
interface, as well as newer vehicles that use a later-generation OBD-II interface." AR 4060.
Samsara asserts that Geotab's participation in the pilot program resulted in unequal access to
information because it "allowed Geotab to develop and refine its OBD-[I] device on actual
LLVs" and "Geotab alone was afforded access to USPS LLV fleet vehicles with OBD-[I]
capabilities prior to proposal submission." [ECF 31] at 17. Additionally, Samsara claims that the
USPS denied Samsara access to an LLV when Samsara requested access during its own pilot
program, which it argues further highlights Geotab's unequal access. *Id.* Samsara contends that
the USPS failed to identify or mitigate the OCI resulting from Geotab's unequal access to the
LLVs. *Id.* at 21.

Samsara is unlikely to succeed in showing that Geotab's participation in its pilot program
created an unmitigated OCI. The advantages gained by Geotab through its participation in the
pilot program are similar, if not the same, as those gained by an incumbent contractor bidding on
a follow-on contract. Incumbent status alone does not give rise to an OCI. *See Ala. Aircraft
Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 686 (2008) *rev'd on other grounds*,
586 F.3d 1372 (Fed. Cir. 2009) ("Incumbent status by itself is insufficient to create an OCI");
*WinStar Commc'ns, Inc. v. United States,* 41 Fed. Cl. 748, 763 (1998). Geotab's mere

participation in the pilot program, while presumably affording Geotab advantages in its pursuit of a contract award under the solicitation, does not necessarily give rise to an OCI. Further, it is well established that agencies are not required to neutralize the inherent advantages experienced by an incumbent contractor.[6] *See One Largo Metro, LLC v. United States*, 109 Fed. Cl. 39, 74 (2013); *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391, 398 (2003); *Galen Med. Assocs., Inc. v. United States*, 56 Fed. Cl. 104, 111 (2003).

Samsara's argument that Geotab had unequal access to non-public information through its access to the LLVs is also unpersuasive. "Unequal access OCIs can occur when a company has access to nonpublic information in performing a government contract that may give it a competitive advantage in a later competition for a government contract." *Turner Const.*, 645 F.3d at 1382. While it may be true that Geotab had access to the LLVs through its pilot program and that other suppliers did not have such access, Geotab's access to the LLVs did not provide it with an unfair competitive advantage under the solicitation. The solicitation made clear that the required OBD-I device needed to be compatible with a 1987-1994 Chevrolet S-10. AR 9, 1846, 1887. The solicitation requirement did not rely upon a data port configuration that was unique to the LLVs to which Geotab had access through its pilot program. Instead, suppliers were able to utilize the publicly available OBD-I interface in a Chevrolet S-10 to address this solicitation requirement. To further demonstrate this point, the record shows that [* * * * * * *] received the [* * * * * * *] as Geotab for its proposed OBD-I interface based on its compatibility with an older model Chevrolet S-10. AR 3182 (assigning a strength to [* * * * * * * * *] telematic solution for its "[a]bility to transmit and interpret OBDI ALDL codes from a Chevy S-10 on simulated USPS routes[.]"). Accordingly, Geotab's access to the LLVs during its pilot program did not give Geotab an unfair competitive advantage.[7]

---

[6] Samsara itself participated in a pilot program regarding telematic solutions for USPS tractor trailers. AR 4-6. As a result, Samsara likely experienced advantages with respect to tractor trailers like the advantages Geotab experienced with respect to LLVs. Therefore, Samsara would have difficulty establishing that it was prejudiced by Geotab's participation in a pilot program. *See G4S Secure Integration, LLC v. United States*, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022).

[7] Another reason Samsara is not likely to succeed with this argument is because it waived the ability to raise it. The Federal Circuit has held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2012). The Federal Circuit has extended this waiver rule to apply to cases involving OCIs. *See Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020); *accord COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (holding that the reasoning of the waiver rule "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."). Here, the solicitation disclosed that there was a pilot program conducted "with a small representative cluster of current USPS vehicles." AR 1877. Additionally, prior to the proposal submission deadline, a supplier asked the USPS "[i]f the pilot was done by an Offeror [*sic*] and [that Offeror] had access to LLVs to create a specialized OBD1 cable as a result of that pilot, how will that advantage be addressed?" AR 1926. Thus, Samsara was, or reasonably should have been, aware of a potential OCI relating to Geotab's access to LLVs prior to the proposal submission deadline. Further, Samsara was also aware that the USPS had previously denied it access to an LLV after Samsara had requested such access during its own pilot program, which concluded in early 2022. Consequently, if Samsara believed that Geotab had a competitive advantage based on its access to LLVs or that access to LLVs was necessary for it to competitively respond to the solicitation, Samsara had ample time prior to the close of the bidding process to raise its objections. By failing to do so, Samsara has waived its ability to raise these arguments in its bid protest. *See Inserso*, 961 F.3d at 1351 (finding that a protestor waived its ability to challenge a potential OCI by not raising a challenge when it "should have known" about the potential OCI).

To the extent that Geotab's participation in the pilot program resulted in an unfair competitive advantage, the record shows that the USPS was aware that Geotab's experience on the pilot program could create an advantage and that it took steps to mitigate any such advantage. In response to Samsara's agency-level protest, the CO explained:

> The [USPS] was aware that two offerors, Samsara and Geotab, had both performed proof-of-concept telematics pilots on [USPS] vehicles in the past few years. We were also aware that Geotab's pilot included several types of vehicles, including the LLVs, and that Samsara's pilot involved only vehicles that used the OBD-II interface. Moreover, we were aware that Geotab's experience potentially gave Geotab a "head start" on developing an OBD-I device for the LLV. We therefore drafted the SOW so as to allow the awardee of the Advanced Telematics contract ample time to develop and then deliver the OBD-I devices. Specifically, the Solicitation provided that the awardee would be given a longer timeframe to deliver a first article OBD-I device (180 days after contract award, rather than the 60 or 90 days required for the two types of OBD-II devices). Further, OBD-I deliveries would not begin until the second year of the contract. These longer timelines for the OBD-I requirements offset any "head start" advantage that Geotab might have had from its pilot experience.

AR 3747-48. Prior to the CO's response to Samsara's agency-level protest, the record does not contain any documentation showing whether the USPS attempted to identify an OCI in connection with the solicitation and what steps it took to mitigate any identified OCIs.[8] Nevertheless, the SP&P do not require that the CO document whether it performed an OCI review or the results of its OCI review. Neither does the APA. *See Impresa*, 238 F.3d at 1337. Further, the USPS is entitled to a presumption of regularity with respect to its compliance with its SP&P, and Samsara carries the heavy burden to demonstrate that the absence of documentation reflects a failure to perform an OCI review. *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 228 (2004); *accord Am. K-9*, 155 Fed. Cl. at 267.

Here, Samsara has not provided any hard facts or evidence to show that the USPS acted arbitrarily and failed to follow its SP&P. Additionally, while post hoc rationales are generally disfavored and must be viewed with skepticism, *see PGBA, LLC v. United States*, 60 Fed.Cl. 196, 204 (2004) ("In examining this expanded record, the Court is mindful that it must critically examine any *post hoc* rationalization."); *accord EnGlobal Gov. Servs., Inc. v. United States*, 159 Fed. Cl. 744, 764 (2022); ; *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020), *aff'd* 22 F.4th 994 (Fed. Cir. 2012), the CO's explanations that the USPS was aware of

---

[8] The only mention of OCIs by the USPS in the record prior to the agency-level protest was in response to two questions relating to OCIs raised during the question-and-answer period. *See* AR 1927, 1930. In response to both questions, the USPS stated that the "USPS takes appropriate measures to remediate and mitigate organizational conflicts of interest as it identifies them." *Id.*

the pilot programs and potential advantages arising therefrom and that the USPS crafted the solicitation requirements in a manner to mitigate such advantages is reasonable and supported by the record.[9] *See* AR 167-68 (providing suppliers with a longer timeframe to deliver OBD-I devices); s*ee D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 (2011) ("The Court may consider explanatory materials that do not offer new rationales for past decisions and that illuminate the methodology the agency employed in making its determination.").

    b. <u>Samsara's Assertion that the Objectivity of the TEC Members was Impaired</u>

   Three members of the seven-member TEC were also involved in the Geotab pilot program. These three members were the Executive Manager for Fleet Strategy & Support, the Executive Manager for Fleet Operations, and an engineer for the Vehicle Center for Excellence. *See* AR 3097, 3752.[10] Samsara argues that these individuals' participation in the Geotab pilot project afforded Geotab an unfair advantage because (1) Geotab had a disproportionate amount of time to influence them; (2) the evaluation of Geotab's technology began at the outset of its pilot program, whereas evaluation of Samsara's technology did not begin until after its proposals was submitted; and (3) Geotab was afforded the opportunity to react to any concerns identified with their proposed solution during the pilot program process, or, in any event, prior to proposals submission. [ECF 31] at 22. Samsara alleges that "[t]hese USPS individuals . . . leveraged their past experience and knowledge and solicited further information providing Geotab an unfair competitive advantage in the procurement." *Id.* at 24. Additionally, Samsara asserts that the USPS supplemented Geotab's proposal through its requests for access to data and "then us[ed] that supplemental information to Geotab's advantage as a part of the evaluation process." *Id*.

   Samsara is unlikely to succeed on these arguments. The advantages that Samsara alleges Geotab experienced because of its participation in the pilot program are like those that any incumbent contractor experiences. An incumbent contractor may have unique advantages, including greater exposure to agency officials, increased opportunity to demonstrate products, and superior knowledge of an agency's objectives and concerns. As explained above, these inherent advantages incumbent contractors experience do not alone result in an OCI, and the agency is not required to "neutralize the competitive advantages some potential offerors enjoy

---

[9] Samsara argues that the USPS's mitigation was not sufficient in that "offerors did not have time to develop the OBD-I capability" because "USPS issued the Solicitation on August 1, 2022 and proposals were due on August 29, 2022 – just 28 days later." [ECF 31] at 26. This argument is not likely to succeed in showing that USPS's mitigation efforts were not rational. Offerors were not required to have fully developed OBD-I capabilities by the time of award. An offeror's OBD-I capability only needed to be developed before first article testing 180 days after award. *See* AR 167-68. Additionally, Samsara, as a prequalified offeror, knew about the OBD-I requirement since December 22, 2021, when the RFI was released. *See* AR 12 ("Can Supplier demonstrate success transmitting engine diagnostic trouble codes and vehicle performance from vehicles with OBDI ports, preferably General Motors (GM) vehicles, specifically the Chevy S10 (model years '87-'94)?"). Samsara does not provide clear evidence that the USPS's mitigation was arbitrary. *See Axiom*, 564 F.3d at 1384.

[10] Based on notes gathered during an interview as part of the USPS's investigation after Samsara's agency-level challenge, the Executive Manager for Fleet Strategy and Support was apparently not involved in the Geotab pilot, as alleged by Samsara. AR 4049.

simply because of their own circumstances[.]" [11] *WinStar*, 41 Fed. Cl. at 763; *see Ala. Aircraft Indus.*, 83 Fed. Cl. at 686. Nevertheless, the USPS is still required to act rationally and without bias in its procurement decisions. In this regard, "[g]overnment officials are presumed to "act 'conscientiously in the discharge of their duties." *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) (quotation marks omitted). When alleging bias, the protestor must overcome the "presumption that the contracting officer acted in good faith." *Info. Tech. & App. Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003); *Am. K-9*, 155 Fed. Cl. at 267. To overcome the presumption of good faith, the protestor must point to "well-nigh irrefragable proof" which amounts to "clear and convincing evidence." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002). Aside from alleging that three members of the TEC were also involved in the Geotab pilot program, Samsara has not pointed to any evidence that shows that the USPS acted with bias in favor of Geotab. Instead, Samsara asks the Court to infer that the USPS acted with impaired objectivity simply because certain members of the TEC also had prior experience with Geotab. This type of inference or speculation is not sufficient to succeed on an OCI claim. Rather, it is logical that the USPS would include its most experienced and knowledgeable staff on the TEC, especially given the significance of the procurement. *See JWK Int'l Corp. v. United States,* 52 Fed. Cl. 650, 659 (2002), *aff'd,* 56 F. App'x 474 (Fed. Cir. 2003); *Fed. Mgmt. Sys., Inc. United States*, 61 Fed. Cl. 364, 369 (2004).

In an apparent attempt to demonstrate the USPS's favoritism towards Geotab, Samsara points to an email between the USPS Executive Manager for Fleet Operations and Geotab in which the Executive Manager requests certain data from Geotab's pilot program. [ECF 31] at 23; AR 4205, 4210. However, this exchange, which occurred after the suppliers submitted their respective proposals, *see* AR 4205, 4210, does not provide clear and convincing evidence that the TEC or any of its members were biased in favor of Geotab or otherwise provided Geotab with an unfair advantage. The email clearly shows that the USPS was requesting data that it already collected as part of the Geotab pilot program. AR 4210 ("I was wondering if I can *regain my access* to the Geo[t]ab site or if you're able to send me [] basic data.") (emphasis added). Further, there is no clear indication that the USPS was requesting this data to supplement Geotab's proposal. Samsara's argument in this regard is purely speculative. Instead, it is possible that the data was requested to support the overall technical evaluation since data generated during the pilot program logically could inform the USPS in its evaluation of all proposals under the solicitation. Thus, Samsara is not likely to succeed on this argument because it has not provided clear evidence of impaired objectivity or bias in favor of Geotab. *See AAR Mfg., Inc. v. United States*, 149 Fed. Cl. 514, 528 (2020) (refusing to find impaired objectivity when allegations are speculative); *accord RhinoCorps Ltd. Co., v. United States*, 87 Fed. Cl. 261, 276 (2009) (rejecting an impaired objectivity argument because "[r]esolution in favor of plaintiff on this issue would require the court to infer too many hard facts.").

---

[11] Additionally, during the SDRO's investigation, it was discovered that Samsara met multiple times with the Executive Manager for Fleet Operations during its pilot program. AR 4065. Thus, it appears that Samsara would have gained a similar advantage through its work on the previous pilot program.

2.      **Samsara's Assertions Regarding the USPS's Technical and Price Evaluations**

Samsara challenges the USPS's technical and price evaluations as arbitrary and capricious. *See* [ECF 31] at 28-37. Samsara asserts that the USPS applied unstated evaluation criteria, disparately treated Samsara's and Geotab's proposals, failed to conduct meaningful discussions, relied on inaccurate price calculations, and failed to evaluate prices on an equal basis. *Id.* The Court finds that Samsara is not likely to succeed in any of its challenges to the USPS's technical and price evaluations.

An agency must evaluate proposals and make awards based on the criteria stated in the solicitation. *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020). The application of unstated evaluation criteria renders an agency's decision arbitrary and capricious. *See NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015) (stating that an offeror can challenge an agency's analysis as "arbitrary, capricious, or an abuse of discretion" when the agency relies on unstated evaluation criteria). To succeed on an unstated evaluation criteria claim, a protester must show that "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed[.]" *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

An agency decision is also arbitrary and capricious when it results from unequal treatment of the offerors. *See CliniComp Int'l Inc., v. United States*, 117 Fed. Cl. 722, 742 (2014) (stating that "unequal treatment is fundamentally arbitrary and capricious, and violates . . . full and open competition"). An offeror is treated unequally when "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). If a protestor demonstrates that the relevant proposals were substantively indistinguishable, a reviewing court may compare and analyze "the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Id.*

a.      Samsara's Assertion that the USPS Employed Unstated Evaluation Criteria when it Assessed a Weakness Relating to its OBD-I Capability

The USPS assigned Samsara's proposal the following weakness: "No OBDI cable currently available, though committed to developing. Committed to completing in time for [First Article Testing]." AR 3155. Samsara asserts that the USPS employed unstated evaluation criteria in assigning this weakness because "the [s]olicitation did not require OBD-I capabilities at the time of award[,]" [ECF 31] at 29, and that "the [s]olicitation was expressly drafted to afford offerors time, post-award, to develop this capability[,]" *id.* at 30. Samsara is not likely to succeed on this argument.

The SOW required that the supplier "create, modify, or acquire software and hardware compatible with the [LLV] OBDI (1987-1994 Chevrolet S- 10 chassis and powertrain) system to log vehicle performance, mileage, fuel usage, and engine diagnostic fault codes." AR 1887. The

solicitation did not require that suppliers have the compatible software and hardware upon contract award but instead that it be furnished for first article inspection within 180 days after contract award. AR 1898-99. The SOW Compliance Matrix required that offerors, as part of their proposal, "provide pictures/diagrams detailing the OBDI form factor connector that correlates to a 1987 Chevrolet S-10." AR 1846. In its proposal, Samsara stated the following with respect to this requirement:



Samsara is committed to developing an OBD-I cable ahead of the date listed in this Statement of Work. [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *].

AR 2715.

Based on the solicitation requirements and Samsara's response, Samsara is unlikely to succeed in this challenge because it does not appear that the USPS used a significantly different basis in evaluating Samsara's proposal from what was stated in the solicitation. The SOW and SOW Compliance Matrix reflect a requirement for an OBD-I cable. The fact that the solicitation provides that an OBD-I cable need not be furnished until 180 days after contract award does not mean that the USPS cannot assess a weakness based on a supplier's proposed approach for satisfying this requirement, including its demonstrated progress (or lack thereof) towards developing such a cable. The solicitation required that suppliers "present sufficient information to reflect a thorough understanding of [the] USPS objectives and requirements and a detailed plan for achieving the objectives of the scope of work." AR 130. In this regard, it appears that the USPS was not impressed by Samsara's proposed approach for meeting this requirement because it essentially stated that Samsara did not possess the required cable and would need to fully develop it after contract award. The USPS's assessment of a weakness against Samsara's proposal because of its lack of an OBD-I cable appears to be rationally based on a stated solicitation requirement and Samsara's proposed approach for satisfying the requirement.[12]

---

[12] Samsara also argues that the USPS engaged in disparate treatment when evaluating Samsara's and Geotab's proposals because the "USPS only afforded Geotab access to OBD-[I] vehicles, resulting in Geotab creating a form-fitting product for the LLVs" and the "USPS then used Samsara's lack of OBD-I capabilities as a differentiator in the award decision." [ECF 31] at 35. This appears to be an extension of Samsara's other arguments, wherein it alleges that Geotab had an unfair competitive advantage and had unequal access to information. *See* [ECF 31] at 14-21. As explained above, Samsara is not likely to succeed on this argument.

        b.       <u>Samsara's Assertion that the USPS Employed Unstated Evaluation Criteria and Misevaluated Samsara's Proposal when it Assessed a Weakness Relating to its Lack of Audible Alerts for Drivers</u>

The USPS assigned a weakness to Samsara's proposal on the grounds that Samsara demonstrated a "potential capability to utilize [Mobile Delivery Device] for custom alerts, but [they] have not yet developed a stand-alon[e] audio-capable accessory . . . when [Mobile Delivery Device] is not available or used." AR 3155. In response to Samsara's agency-level protest, the USPS CO explained:

> [O]ne potential method of providing audible alerts through the USPS infrastructure would be through the Mobile Delivery Devices (MDDs) used by letter carriers operating delivery vehicles. MDDs, however, are used only in delivery operations. Samsara did not propose a means of providing audible alerts to personnel performing non-delivery operations. Samsara's proposed approach to conveying audible alerts was, therefore, reasonably assessed as a weakness because it relied on the MDD.

AR 3751. Samsara argues that this weakness is "unreasonable and inconsistent with Samsara's proposal and the [s]olicitation requirements." [ECF 31] at 31. Samsara asserts that "the assignment of a weakness for all alleged lack of alerts for personnel performing non-delivery operations is inconsistent with the terms of the solicitation" because "nothing in the SOW speaks to a distinction between delivery and non-delivery operations." *Id*. at 32. Additionally, Samsara argues that its proposed audible alert solution not only met the SOW's requirements but offered additional features that USPS should have considered as strengths." *Id*. Samsara is unlikely to succeed on this challenge as well.

The SOW provided:

> The [telematic] device must be able to signal to the driver by way of an auditory alert for any unacceptable driving events, such as speeding, abnormal acceleration, and harsh braking. The audible beeping must continue until the driver modifies their behavior. The audible alerts must be customizable so as to enable USPS personnel to modify which driving events trigger the alert.

AR 1884. In its proposal, Samsara stated:

> Samsara meets this requirement in multiple ways. [* * * * * * * *
> * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
> * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
> * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
> * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
> * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

* * * * * * * * * ].  In this way, any Samsara alert can trigger an in-cab safety alert for drivers via the existing USPS handheld scanners.

AR 2717. In its proposal, Samsara further noted: [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]. AR 2667.

Based on the solicitation requirements and Samsara's response, Samsara is unlikely to succeed in this challenge because it does not appear that the USPS used a significantly different basis in evaluating Samsara's proposal from what was stated in the solicitation. Samsara is correct that the solicitation does not distinguish drivers performing delivery and non-delivery operations, but this is not relevant. The SOW requires that the device be capable of providing an audible alert for "drivers." AR 1884. This logically refers to all drivers, not just drivers carrying an MDD. Based on this requirement, the USPS did not employ unstated criteria by assigning a weakness to Samsara's proposal which provided for the audible alert to be delivered through a [* * ** * * *] that would not always be inside of the vehicle—meaning that if the device were not in the cabin, the driver would not be signaled by an auditory alert. *See Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020) ("An agency may consider elements that, while not explicitly stated in the solicitation, are intrinsic to the stated factors." (quotation marks omitted)); *Banknote Corp.*, 56 Fed. Cl. at 387.

Additionally, the weakness is not inconsistent with the contents of Samsara's proposal. Samsara refers to a figure in its proposal that depicts its approach for delivering audible alerts to USPS drivers, which it argues sends notifications to both the vehicle and scanner. AR 2667. However, while the figure clearly shows that audible alerts would be delivered by the [* * * * * * * * * * * * * * * * * * *], it does not show that alerts would be delivered by the vehicle. *See id*. To the contrary, it explicitly states that [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. *Id*. Therefore, the USPS's assessment of a weakness against Samsara's proposal for its failure to deliver audible alerts to drivers when a mobile device was not available or used appears to be rationally based on a stated solicitation requirement and Samsara's proposal.

Samsara also argues that the USPS should have considered certain additional features contained in Samsara's proposal as strengths. [ECF 31] at 32. This argument merely reflects Samsara's disagreement with the USPS's evaluation of its proposal, and the Court will not second-guess what the USPS considers to be a strength in connection with its procurement. *Impresa*, 238 F.3d at 1340; *Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 218 (2006) ("[A] protestor's mere disagreement with the agency's evaluation determination does not provide a basis for sustaining the protest."); *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009).

       c.      <u>Samsara's Assertion that the USPS Employed Unstated Evaluation Criteria and Misevaluated Samsara's Proposal when it Assessed a Weakness Relating to its Lack of FedRamp Authorization</u>

The USPS assigned a weakness to Samsara's proposal on the basis that Samsara "does not have FedRAMP authorization." AR 3155. Samsara argues that this weakness amounts to the

application of unstated evaluation criteria because the solicitation did not require offerors to "demonstrate FedRAMP authorization at the time of award." [ECF 31] at 33. Samsara also argues that this weakness is inconsistent with its proposal and that the USPS treated its proposal disparately with respect to FedRAMP authorization status. *Id*. at 34-35.

Section 3.2.8 of the SOW contained the following cloud security and FedRAMP requirements:

> In support of a solution hosted in a Cloud Service Provider's (CSP's) cloud, the Supplier must have:

> A.   A FedRAMP Authorization to Operate is Mandatory for Postal Service Platform as a Service (PaaS) and Infrastructure as a Service (IaaS) cloud deployments and service models at the low-, moderate-, and high-impact levels, as determined by USPS CISO.

> B.   The Supplier is responsible to provide status of FedRAMP authorization i.e., Final (provide FedRAMP ID), in Progress (provide FedRAMP ID), FedRAMP Ready (provide FedRAMP ID or indicate a Not Started. The Provider must provide the FedRAMP ID allowing the Postal Service to collect FedRAMP documents from Max.gov for PaaS and IaaS.

> C.   In support of the USPS certification and accreditation process, the Supplier must create, maintain, and update security documentation using FedRAMP requirements and templates, which are available at http://FedRAMP.gov.

> D.   An Assessment and Authorization (A&A) Package is required for a SaaS environment that is not FedRAMP Authorized. The Postal Service does not require a FedRAMP Authorization for Software as a Service (SaaS) environments. SaaS will be reviewed using the USPS driven process of the AS 805 Certification and Accreditation.

AR 1889. Section 3.2.8 of the SOW matrix advised suppliers to provide "FedRamp Authorization Documentation, SOC II Type II documentation, or related security information for USPS review." AR 1851. During the question-and-answer period, the USPS stated that "[i]n regard to Section 3.2.8, [s]uppliers are to demonstrate ability to comply with A, B, C and D" and that "[t]he [USPS] will consider potential suppliers' FedRAMP Packages in its [Certification and Accreditation] process, if available." AR 1933.

In response to this requirement, Samsara stated: "Samsara complies with this requirement." AR 2722. Samsara further stated: [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *] among others. *Id*. Samsara also attached a copy of its SOC II Type II report.

Samsara is unlikely to succeed in its claim that the USPS employed unstated evaluation criteria when it assigned a weakness to Samsara's proposal for not having FedRAMP authorization. While the SOW is clear that FedRAMP authorization is not required for SaaS solutions, *see* AR 1889, a supplier's FedRAMP authorization status was clearly an element that would be considered by the USPS when evaluating proposals against the SOW requirements. Therefore, the USPS did not employ unstated evaluation criteria by assigning strengths and weaknesses based on a supplier's FedRAMP authorization status.

Samsara asserts that "it relied on a SaaS solution that ha[d] already completed the USPS A&A Package[,]" as permitted by paragraph D under Section 3.2.8, and that therefore FedRAMP authorization was not necessary for its proposed solution. [ECF 31] at 34. However, in its response to this requirement, Samsara did not state that it was relying exclusively on a SaaS solution, such that FedRAMP authorization as required for PaaS and IaaS was not necessary, nor did it state that its SaaS solution had already completed the USPS A&A package, as part of its pilot program. *See* AR 2722. Thus, the USPS's assessment of a weakness against Samsara's proposal because it does not have FedRAMP authorization appears to be rationally based on a stated solicitation requirement and Samsara's proposal.  *See Harmonia Holdings Grp., LLC v. United States*, 136 Fed. Cl. 298, 308 (2018) ("The offeror bears the burden of presenting an adequately written proposal that satisfies the requirements of the solicitation." (quoting *Mercom, Inc. v. United States*, 131 Fed. Cl. 32, 40 (2017))).

Samsara also argues that, while the USPS scrutinized Samsara for its FedRAMP capabilities, it gave Geotab [* * * *] and [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. [ECF 31] at 35. Additionally, Samsara contends that, while penalizing Samsara for lacking FedRAMP authorization, the USPS "awarded [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]." *Id*. at 34 (quoting AR 2977). Samsara states that it also utilized AWS and was willing to become FedRAMP certified at the SaaS level. *Id*. Samsara's disparate treatment arguments are unavailing because Geotab's and [* * * * * * * *] proposed FedRAMP capabilities are substantively distinguishable from Samsara's.

In its response to the SOW compliance matrix, Geotab states that [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. AR 2066. Geotab further explained that it [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. *Id*. The USPS assigned [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. AR 3110. The assignment of this [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. The Court is not persuaded by Samsara's argument that Geotab

provided a "limited" FedRAMP authorization and that the USPS permitted Geotab to engage with the USPS regarding Geotab's shortcomings. Geotab's proposal [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. In Geotab's best and final offer submission, Geotab [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. AR 4250. Geotab [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. *See id*. This response did not limit or otherwise affect Geotab's FedRAMP authorization.

[* * * * * * * *] stated in its response [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. AR 2557. [* * * * * *] also explained that [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. *Id*. The USPS assigned [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. AR 3183. The USPS had a rational basis for [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. Further, while both [* * * * * * * *] and Samsara proposed using [* * * * * * * * * * * * * * * * * * * * * *][* * * * * * * * *] explained that [* * * * * * * * * * * * * * * * * * * * * * * * * *] . *See* AR 2557. Samsara [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. *Compare id with* AR 2722. As such, it appears that Samsara's [* * * * * * * * * * * * * * * * * * * * * * * * * * * *] —was distinguishable from the proposals submitted by Geotab and [* * * * * * *] and that the USPS did not act unreasonably for downgrading Samsara's proposal. *See Off. Design Grp.*, 951 F.3d at 1372.

> d.      Samsara's Assertion that the USPS Failed to Conduct Meaningful Discussions

Assuming *arguendo* that the USPS's assessed weaknesses were rational, Samsara argues in the alternative that the "USPS further mislead Samsara as to USPS's real concerns with Samsara's technical proposal" because it "never alerted Samsara to these purported shortcomings despite engaging in discussions with Samsara." [ECF 31] at 36. Because the weaknesses assigned to Samsara's proposal regarding its OBD-I capabilities, audible alert technology and FedRAMP authorization were not raised by the USPS during discussions, Samsara argues that the USPS failed to engage in meaningful discussions. *Id*. at 37. Samsara is not likely to succeed on this challenge.

SP&P 2-37.1 provides that "[d]iscussions are held when the purchase/SCM team needs to generate further information and facts regarding proposed terms and conditions, and clarify any possible misunderstandings with a supplier." It further provides that, during the evaluation process, discussions "*may* be held with any supplier to clear up misunderstandings or uncertainties or to gain a better understanding of the supplier's proposal (including price) in order to obtain a more informed comparison of the relative value of individual proposals." *Id*. (emphasis added).

Despite Samsara's argument to the contrary, the USPS was not obligated by its SP&P to alert Samsara of the challenged weaknesses during discussions. The SP&P simply explains that discussions *may* be held when additional information and clarifications are needed. Additionally, even when the USPS conducts discussions, the discussions are not required to address every aspect of a supplier's proposal that may receive a weakness. *See Banknote Corp.*, 56 Fed. Cl. at 385 (applying discussions standards from the FAR to USPS procurements) ("[I]t is well-accepted that '[COs are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.'"). In this case, the challenged findings were weaknesses. They were not findings that resulted in Samsara's proposal being deemed deficient or otherwise unacceptable. The CO had discretion regarding what elements of Samsara's proposal required additional information or clarification to improve the USPS's understanding. *See Standard Comm'ns, Inc. v. United States*, 101 Fed. Cl. 723, 740 (2011); *see also Cube Corp. v. United States*, 46 Fed. Cl. 368, 383-84 (2000). It does not appear that the USPS failed to engage in meaningful discussions.

<blockquote>e.   <u>Samsara's Assertion that the USPS's Installation Cost Calculation was Inaccurate</u></blockquote>

Samsara argues that the USPS's total evaluated price for its proposal of $[* * * * * * * *] was inaccurate because the USPS miscalculated Samsara's proposed installation cost. [ECF 31] at 37. Samsara states that the USPS should have calculated its installation cost by multiplying the best estimate quantity of 287,029 set forth in the solicitation by its proposed $[* * * ] per unit installation price to arrive at a total installation cost of $[* * * * * *], which is $[* * * * *] less than the $[* * * * * * ] used by the USPS. *Id*. at 37-38.

Samsara is unlikely to succeed on this argument. Arguably, Samsara is correct that the USPS should have used the best estimate quantity of 287,029 to calculate the installation cost by supplier. *See* AR 1907 (reflecting 287,029 as the "Best Estimate Quantity"); AR 1926 (stating that the "Best Estimate Quantity will be used to support estimation of total program costs"); AR 3754 (stating that "the Best Estimate Quantity (287,029 devices) from Table 17 in the SOW was used in the price evaluation"). However, the total number of devices used to calculate the installation cost is not determinative of this issue because Samsara and Geotab proposed the same per unit installation price. Thus, regardless of the quantity used, Samsara's and Geotab's proposed installation prices would be the same, and installation cost would not affect the price differential between them.

Further, in its opposition to Samsara's motion for a preliminary injunction, the government explains how the USPS arrived at the $[* * * * * *] evaluated installation costs applied to Samsara and Geotab, and its explanation is supported by the record. The government states that the USPS "took into account the likelihood that it would self-install a portion of the telematic devices" and, for the devices installed by the USPS, the installation cost per unit would be $[* * *]. [ECF 34] at 36. Thus, according to the government, the USPS's evaluated installation price was based on Samsara and Geotab each installing 201,265 devices at a per unit cost of $[* * *] for a total installation cost of $[* * * * ], and the USPS installing 79,711 devices at a per unit cost of $[* * *] for a total install cost of $[* * * * *]. *Id*. When added together, the amount of the supplier-installation costs and USPS self-installation costs applied to Samsara and

Geotab came to $[* * * * * *]. *Id.* This explanation is sufficiently supported by the record and supports the conclusion that the USPS rationally evaluated installation costs.[13]

> f.  Samsara's Assertion that the USPS Failed to Conduct an Equal Price Evaluation

Samsara argues that the USPS failed to conduct an equal price evaluation because, while Samsara proposed flat pricing, Geotab's prices included significant options and fees that the USPS failed to calculate. [ECF 31] at 38. Section 2-34.1 of the SP&P provides as follows:

> When evaluating potential suppliers' proposals, the pricing analyst should compare not only the price, but also the terms and conditions of the proposal. Often, these terms and conditions will differ with regard to delivery schedule and upgraded technology to the point that a direct comparison between proposals cannot be made. *Therefore, the pricing analyst must "level" the proposals to meet the basic requirements of the RFP to ensure that the price evaluation is performed on proposals with comparable terms and conditions.* This may be accomplished by removing additional or upgraded services or components from the overall proposal and proposed price so that the price evaluation can be made only with regard to the terms and conditions explicitly stated in the RFP.

SP&P 2-34.1 (emphasis added). Samsara contends that the USPS failed to "level" the proposals as required by SP&P 2-34.1. [ECF 31] at 38. In support of its position, Samsara points to "the cost of [Original Equipment Manufacturer ("OEM")] data feed" and the additional cost of "waterproof versions of its device" as examples of options that the USPS failed to consider. *Id.* Samsara also notes [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. *Id.*

Samsara is unlikely to succeed on this challenge to the USPS's price evaluation. The record demonstrates that the USPS added [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *] consistent with the SP&P guidance. *See* AR 3168-69. With respect to Samsara's examples, Samsara does not demonstrate that an OEM data feed or a waterproof version of the devices were requirements under the SOW, such that the USPS should have added these options for pricing purposes. Therefore, these examples do not demonstrate that the USPS failed to comply with the SP&P guidance.

---

[13] The government states that "the total number of devices assumed for installation by the supplier came to 201,265." [ECF 34] at 36. However, the Court is unable to verify this number. The record supports the conclusion that the USPS planned to use the best estimate quantity of 287,029 devices for price evaluation purposes. AR 1907, 1926. Nevertheless, this discrepancy is not relevant because the record demonstrates that [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *], that the USPS's self-installation cost was $[* * *], and that the percentage of vehicles for the supplier to install was 72% for both Samsara and Geotab. AR 3193. Even if the total quantity of devices to be installed fluctuated, [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *].

On the other hand, Samsara's argument that the USPS failed to consider the impact of the additional fees for remote/rural installations as shown in Geotab's proposal does have some probability of succeeding on the merits. The record shows that Geotab included [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]. AR 2217, 2227. The record also shows that the USPS sought clarity on the [* * * * * * * * * * * * * *] proposed by Geotab, *see* AR 4245-46, and that Geotab responded by [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. AR 4250. Significantly, the record does not demonstrate whether and how the USPS factored this [* * * * * * * * * * * * *] into its evaluation of Geotab's proposed price. Thus, Samsara has a legitimate argument that this aspect of the USPS's price evaluation was arbitrary.

Nevertheless, even if Samsara were to succeed in showing that the USPS acted arbitrarily by [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *], Samsara is not likely to be able to show the requisite prejudice to succeed in its protest. In its pricing proposal, Samsara stated: [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. AR 3096. Samsara explained during price negotiations that "[* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]." AR 4238. It is unclear, however, if the USPS factored in [* * * * * *] when evaluating Samsara's proposed installation cost and, thus, the evaluation of Samsara's price appears to potentially suffer from the same flaw as Geotab's. Additionally, due to Geotab's significantly superior technical proposal, it is unlikely that the [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *] would have substantially increased Samsara's chance of award. *See Bannum, Inc. v. United States*, 404 F.3d 1348, 1357-58 (Fed. Cir. 2005) ("To establish prejudice [protestor] was required to show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors in the bid process."); *see also G4S Secure Integration LLC v. United States*, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022) (finding no prejudice when "the plaintiffs benefited from the agency's error in the same way that the defendant-intervenor did."); *VS2, LLC v. United States*, 155 Fed. Cl. 738, 767-69 (2021). Accordingly, Samsara is unlikely to succeed on its challenge that the USPS engaged in an unequal price evaluation.

### 3.    Samsara's Assertion that the USPS's Best Value Tradeoff was Flawed

Samsara argues that the USPS's best value trade-off determination was "irreparably tainted" by "significant conflicts of interest[,]" "USPS's myriad errors in evaluating Samsara's and Geotab's technical and price proposals, and USPS's unreasonable and unequal discussions[.]" [ECF 31] at 33-4. Because Samsara has not shown that it is likely to succeed on its challenges to the USPS's handling of the alleged OCIs and evaluation of the proposals, *see supra* Sections III.A.1-3, Samsara's argument that the USPS's best value trade-off was tainted by these flaws is also not likely to succeed. Moreover, the record shows that the USPS's best value trade-off analysis was consistent with the terms of the solicitation and had a rational basis. *See Newimar S.A. v. United States*, 160 Fed. Cl. 97, 133-34 (2022) ("A derivative best-value challenge cannot stand on a rejected challenge to another aspect of the agency's evaluation.") (citing *Ace-Fed. Reps., Inc. v. United States*, 150 Fed. Cl. 94, 122 (2020)).

The solicitation stated that "the contract award decision [would] be based on 'Best Value.'" AR 136 (emphasis omitted). It further explained that the contract "[a]ward [would] be made to the capable Offeror who submits the best combination of Technical and Price Proposals" based on a tradeoff between technical merit and price *Id.* In conducting the best value tradeoff, the solicitation stated that "technical factors are considered more important than price." *Id.* (emphasis omitted). Additionally, it stated that "[t]he USPS [would] not make an award for a significantly higher priced proposal unless its technical rating indicate[d] a relatively proportionate higher technical performance." *Id.*

The record shows that the CO adhered to these evaluation terms and provided a rational basis for selecting Geotab for contract award. After analyzing the evaluation results, the CO stated that Geotab provided the highest evaluated technical ranking over Samsara and [* * * * * * * * *] because [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *].  AR 3200. Regarding price, the CO stated that "Geotab [was the [* * * * *] proposal price; however, it [was] only [* * * * * *] more than Samsara who [was] rated the [* * * * * * *] technically for the 9-year contract period. ([* * * *] is [* *] of the total price.)[.]" AR 3199. The CO concluded that "[i]n light of the superior technical features of the Geotab solution, competitively priced subscription service and lowest overall risk . . . Geotab offer[ed] the best value to the Postal Service." AR 3200. This provides a rational basis for the CO's best value trade-off analysis and decision to select Geotab for award. *See MVM, Inc. v. United States*, 149 Fed. Cl. 478, 491 (2020) ("[T]he government's best value determination should not be disturbed, if the government documents its analysis and includes a rationale for any business judgments and trade-offs made in reaching that decision."); *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 522-23 (2013).

## B.     Irreparable Harm

Absent injunctive relief, Samsara claims that it will suffer irreparable harm because it "will lose any expected profit from any work performed by Geotab" and it "will forever lose its opportunity to compete fairly for this work[.]" [ECF 31] at 41. Samsara further asserts that if Geotab is allowed to continue to perform then the USPS will continue to accept and install Geotab devices, which would impair the potential remedies should its protest be sustained. *Id.* As an example, Samsara posits that the "USPS could consider Geotab's significant, albeit impermissible, install base in any re-award decision." *Id.*

Samsara's claimed harms do not constitute a showing of irreparable harm. An irreparable harm exists when, absent a preliminary injunction, the movant would be deprived of the only remedy available if it were to succeed on the merits of its claim. *See Qingdao Taifa Grp. Co., Ltd. v. United States*, 581 F.3d 1375, 1379 (Fed. Cir. 2009); *IBM Corp. v. United States*, 118 Fed. Cl. 677, 683 (2014). Further, to show irreparable harm, the movant must demonstrate that "irreparable injury is *likely* in the absence of an injunction, not that it is a mere possibility. *See Winter*, 555 U.S. at 22 (emphasis in the original). If Samsara ultimately prevails on the merits of its protest, it will have an opportunity to compete for the award in a new competition. *See Harmonia Holdings Grp., LLC v. United States*, 156 Fed. Cl. 238, 248 (2021). Further, Samsara's argument that Geotab will have an advantage in a new competition as a result of its

continued performance of the contract is too generalized and speculative to establish irreparable harm for the purpose of granting the extraordinary remedy of injunctive relief. *See Lockheed Martin Corp. v. United States*, 124 Fed. Cl. 709, 729 (2016) ("[A] plaintiff may not show irreparable harm by claiming generically that the winner's transition into performance will give it advantages."); *accord Next Phase Sols. & Servs., Inc. v. United States*, 164 Fed. Cl. 15, 26 (2023); *SVD Stars II, LLC v. United States*, 138 Fed. Cl. 483, 488 (2018). As the government represented during oral argument, if Samsara succeeds in its protest and there is a new procurement that results in a new awardee, the USPS is prepared to remove any devices installed by Geotab during the pendency of this protest. *See* Oral Arg. Tr. [ECF 36] at 98:7-100:3; *see also id.* at 100:16-21. This effectively mitigates any advantage that Geotab would gain by its continued performance of the contract during this protest.

## III.    CONCLUSION

Because Samsara has not demonstrated that it is likely to succeed on the merits of its bid protest and that it will suffer irreparable harm absent injunctive relief, Samsara is not entitled to a preliminary injunction, and the Court does not need to address the balance of harms and public interest factors. *See Altana Pharma AG*, 566 F.3d at 1005; *Amazon*, 239 F.3d at 1350; *Reebok Intern. Ltd. v. J. Baker, Inc.* 32 F.3d 1552, 1556 (Fed. Cir. 1994) (stating that "a movant must establish both a likelihood of success on the merits *and* irreparable harm . . . [and] the district court may deny a preliminary injunction based on the movant's failure to establish either of these two crucial factors without making additional findings respecting the other factors.").

Samsara's motion for a preliminary injunction is **DENIED**. The parties **SHALL FILE** a joint status report with their proposed schedule for further proceedings **on or before June 9, 2023**. Some information contained in this Opinion and Order may be considered protected information subject to the Protective Order entered on March 20, 2023. *See* [ECF 13]. Accordingly, the Opinion and Order is filed **UNDER SEAL**. The parties **SHALL CONFER AND FILE**, on or before **June 9, 2023**, a joint status report that: identifies the information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge