# In the United States Court of Federal Claims

No. 23-361

(Filed: January 4, 2024)

(Reissued for Publication: January 22, 2024)[1]

```
*****************************************
SAMSARA INC.,                           *
                                        *
              Plaintiff,                *
                                        *
v.                                      *
                                        *
THE UNITED STATES,                      *
                                        *
              Defendant,                *
                                        *
and                                     *
                                        *
GEOTAB USA, INC.,                       *
                                        *
              Defendant-Intervenor.     *
*****************************************
```

*John E. McCarthy, Jr.*, Crowell & Moring LLP, Washington, DC, *David B. Robbins*, *Nathaniel E. Castellano*, and *Aime J. Joo*, Jenner & Block LLP, Washington DC, counsel for Plaintiff. With whom were *Zachary H. Schroeder* and *Isaac D. Schabes*, Crowell & Moring LLP, of counsel.

*Kara M. Westercamp*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Wendy Harris*, Commercial and Appellate Litigation Law Department, U.S. Postal Service, of counsel.

*Robert Nichols*, Nichols Liu LLP, Washington, DC, counsel for Defendant-Intervenor. With whom were *Michael Bhargava* and *Sam Van Kopp*, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

---

[1] This Order and Opinion was filed under seal on January 4, 2024, *see* [ECF 64], in accordance with the Protective Order entered on March 20, 2023, *see* [ECF 13]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on January 18, 2024, with agreed upon proposed redactions. [ECF 67]. The Court accepts all but one redaction. The rejected redaction would remove an "*Id.*" in the opinion. The Court does not find that this redaction is warranted. The accepted redactions are indicated by bracket asterisks, *e.g.*, "[* * *]." The Court has also modified the caption.

Samsara, Inc. ("Samsara") protests a decision by the United States Postal Service ("USPS") to award a contract for the procurement of a telematics system for USPS vehicles to Geotab USA, Inc. ("Geotab"). Samsara contends that the USPS applied unstated evaluation criteria and provided Geotab with an improper competitive advantage, that it erred in assigning Samsara a weakness based on a lack of FedRAMP authorization, that its risk evaluation was arbitrary and capricious, that it conducted a flawed price evaluation, and that the sum of these errors led to an erroneous best value determination. For the reasons set forth below, the Court finds that the USPS applied unstated evaluation criteria in its evaluation of Samsara's proposal and performed an arbitrary risk evaluation, which resulted in a flawed best value determination. Accordingly, Samsara's motion for judgment on the administrative record is **GRANTED**, and the government's cross-motion is **DENIED**.

## I.    BACKGROUND[2]

Samsara's bid protest relates to the procurement of telematics devices by the USPS for installation into its vehicle fleet. *See* AR 1875.[3] The USPS operates a fleet of over 230,000 vehicles that fall into three categories: (1) delivery vehicles, such as the Grumman Long Life Vehicles ("LLV"); (2) logistics vehicles consisting of tractors, trailers, and cargo vans; and (3) non-mail hauling vehicles used for administrative and maintenance support. *Id.* The USPS intends to use telematics devices to "monitor the health and locations of the vehicles." *Id.* The telematics devices "will inform drivers of safety warnings, provide fuel savings (through driver behavior modification and enhanced maintenance), and provide vehicle health details" for maintenance purposes. *Id.* The telematics devices "plug[] into a vehicle's data port . . . and provide[] near real-time information on the operating condition of the vehicle—mileage, location, acceleration/deceleration, battery condition, fluid levels, tire pressure . . ., etc." *Id.* The USPS fleet includes heavy duty vehicles, medium/light duty vehicles, light duty vehicles, and trailers. AR 1878-79. The heavy duty and medium/light duty vehicles have On Board Diagnostic 2 ("OBDII") data ports, and the light duty vehicles, which include the LLVs, have On Board Diagnostic 1 ("OBDI") data ports. *Id.*

The solicitation stated that suppliers "should present sufficient information to reflect a thorough understanding of USPS objectives and requirements and a detailed plan for achieving the objectives of the scope of work" and that "proposals shall not merely paraphrase the requirements of the USPS' scope of work . . . or use phrases such as 'will comply' or 'standard techniques will be employed.'" AR 130. It provided that the USPS would evaluate each technical proposal according to three factors: Factor 1 – Telematics Solution, Factor 2 – Supplier

---

[2] Additional factual background may be found in the Court's earlier opinion and order denying Samsara's motion for preliminary injunction. *See Samsara, Inc. v. United States*, 166 Fed. Cl. 457, 463-65 (2023).

[3] The government initially filed the administrative record on March 29, 2023. [ECF 27]. Subsequently, the government moved to correct the administrative record with "documents related to the agency's request for revised pricing proposals and the responses," [ECF 28], which the Court granted. [ECF 29]. The government then filed a corrected administrative record on April 3, 2023. [ECF 30]. Samsara filed a motion to complete the record on July 21, 2023. [ECF 48]. After the Court granted-in-part and denied-in-part Samsara's motion to complete the administrative record, [ECF 52], the government filed a completed administrative record on August 25, 2023. [ECF 54]. The Court cites to the complete administrative record filed by the government at [ECF 54-1, 54-2, 54-3, 54-4] as "AR ___."

Capability, and Factor 3 – Past performance. AR 137. It further explained that "Factor 1 is considered more important than Factor 2 and Factor 2 is significantly more important than Factor 3." *Id.* Regarding price, the USPS would evaluate the price elements in the pricing template to determine fairness and reasonableness. AR 138. The solicitation further provided that the USPS would not adjectivally rate price proposals but would "determine that the proposed pricing [was] fair and reasonable through historical data, market factors, or competition." *Id.* The USPS would evaluate proposed pricing "over the total anticipated period of performance (base and all options)." *Id.*

To score the proposals, the USPS would evaluate each technical proposal to determine its strengths, weaknesses, and risks and then assign adjectival ratings of unacceptable, poor, fair, good, very good, or excellent for each factor. AR 137-38. Each adjectival rating had a corresponding numerical value. AR 3189. The USPS would also use "an adjectival rating scale with ratings from Low to High" and a ten-point scoring system to assess each supplier's technical risk. AR 3188. The USPS defined the adjectival risk ratings and corresponding scores as follows:

| Adjectival Scoring Matrix (Risk) | | |
|---|---|---|
| Adjectival | Definition | Score |
| Low Risk | Offeror's proposal or past performance record provides **little or no doubt** that the offeror will successfully perform the required effort. | 10 |
| Moderate Risk | Offeror's proposal or past performance record provides **some doubt** that the offeror will successfully perform the required effort. | 5 |
| High Risk | Offeror's proposal or past performance record provides **substantial doubt** that the offeror will successfully perform the required effort. | 0 |

*Id.* The USPS would then select the proposal that represents the best value for contract award. AR 136. In determining which proposal represents the best value, the solicitation indicated that "technical factors are considered more important than price." *Id.* (emphasis omitted). It further noted that, "[a]lthough price will be considered in the award decision, the award may not necessarily be made to the supplier submitting the lowest price" and that "[t]he USPS will not make an award for a significantly higher priced proposal unless its technical rating indicates a relatively proportionate higher technical performance." *Id.*

The USPS received eight proposals, including those from Samsara, Geotab, and another offeror, [* * *]. *See* AR 3105. Following the technical evaluation, Geotab received the highest combined technical and risk score of 95.5. AR 3195. Samsara and [* * *] each received the second highest combined score of 83.0. *Id.* These scores accounted for Geotab receiving an overall risk score of ten, and Samsara and [* * *] each receiving an overall risk score of five. *Id.* Because Samsara, Geotab, and [* * *] received the highest technical scores and had the best chance of providing the USPS with the best value, the USPS held price negotiations with each.

*Id.* While the Contracting Officer ("CO") determined that all three suppliers were within the reasonable price range, each supplier was provided an opportunity to submit revised pricing to improve their pricing and clarify certain costs. AR 3196. Based on the evaluation results and price negotiations, the CO scored the suppliers as follows:

| Offeror | Technical/Risk Score | Evaluated Price |
|---------|----------------------|-----------------|
| Geotab | 95.5 | $281,810,863 |
| Samsara | 83.0 | [* * *] |
| [* * *] | 83.0 | [* * *] |

AR 4069;[4] *accord* AR 3195-96. The CO ultimately determined that Geotab represented the best value offeror "[i]n light of the superior technical features of the Geotab solution" and Geotab's "competitively priced subscription service and lowest overall risk." AR 3200.

The USPS awarded the contract to Geotab on November 17, 2022. AR 3453. Following a post-award debriefing, AR 526-27, Samsara submitted an agency-level protest to the CO on December 12, 2022, AR 3528-62. The CO denied Samsara's protest on December 22, 2022. AR 3745-56. Samsara appealed the CO's decision to a Supplier Disagreement Resolution Officer ("SDRO"). AR 3757-803. On March 8, 2022, the SDRO also denied Samsara's protest. AR 4056-72.

Samsara filed the instant bid protest on March 13, 2023, alleging that the USPS's decision to award the contract to Geotab was arbitrary, capricious, and contrary to law and applicable regulations. Compl. [ECF 1]. Geotab intervened on March 15, 2023. Mot. to Intervene [ECF 10]. During the initial status conference, the government stated that the USPS did not agree to voluntarily stay performance of its contract with Geotab. On April 3, 2023, Samsara sought a preliminary injunction. [ECF 31]. The Court denied Samsara's motion on May 26, 2023.[5] [ECF 37]. Thereafter, on July 21, 2023, Samsara moved to complete the administrative record. [ECF 48]. The Court granted-in-part and denied-in-part Samsara's motion on August 17, 2023,[6] [ECF 52], and the government completed the administrative record the following week. [ECF 53]. Samsara moved for judgment on the administrative record on September 22, 2023. [ECF 58]. The government opposed Samsara's motion and cross-moved for judgment on the administrative record on October 20, 2023. [ECF 61]. Geotab opposed Samsara's motion on the same day. [ECF 60]. The motions are fully briefed, and the Court held oral argument on November 13, 2023. *See* [ECF 57].

## II.    LEGAL STANDARDS

---

[4] This table was modified to reflect only the offerors relevant to this protest.

[5] The Court issued the sealed opinion and order on May 26, 2023, [ECF 37], and the unsealed opinion and order on June 23, 2023, [ECF 41].

[6] The Court issued the sealed memorandum opinion and order on August 17, 2023, [ECF 52], and the unsealed memorandum opinion and order on October 11, 2023, [ECF 59].

Under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), a party may file a motion for judgment on the administrative record to assess whether a federal administrative body acted in accordance with the legal standards governing the decision under review. *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019). An RCFC 52.1 motion "is often an appropriate vehicle to scrutinize an agency's procurement actions because such cases typically involve interpretation of contract documents or regulations, thereby presenting no disputed issues of material fact." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004). A motion for judgment on the administrative record "provide[s] for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). This Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

The court reviews bid protests using the standard of review set forth in the Administrative Procedure Act ("APA"), *see* 28 U.S.C. § 1491(b)(4), which permits the court to set aside an agency's contracting decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2018); *see Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001).The court may set aside a bid protest award if "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States,* 953 F.3d 1373, 1377 (Fed. Cir. 2020). The "arbitrary or capricious standard . . . is highly deferential" to the agency's decision and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A protestor "bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (internal quotation marks omitted). In addition to showing that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, the protestor "must then show that it 'was prejudiced as a result – that it had a substantial chance to receive the award but for that error.'" *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 128 (2022) (quoting *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386-87 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)).

An agency decision is arbitrary and capricious if the decision is a product of the agency's application of unstated evaluation criteria. *See NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015) (stating that an offeror can challenge an agency's analysis as "arbitrary, capricious, or an abuse of discretion" when the agency relies on unstated evaluation criteria). An agency must evaluate proposals and make awards based on the criteria stated in the solicitation. *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020). To succeed on an unstated evaluation claim, an offeror must show the agency "used a significantly different basis in evaluating the proposals than was disclosed." *Wellpoint Mil. Care Corp. v. United States*, 144 Fed. Cl. 392, 404 (2019), *aff'd*, 953 F.3d 1373 (Fed. Cir. 2020). "[A]n agency . . . has 'great discretion in determining the scope of an evaluation factor.'" *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009) (quoting *Forestry Survs. & Data v. United States*, 44 Fed. Cl. 493, 499 (1999)). Further, "it is well-settled that 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'" *Banknote Corp.*, 56 Fed. Cl. at 387 (quoting *Analytical & Rsch. Tech., Inc. v. United States*, 39

Fed. Cl. 34, 45 (1997)). However, an agency's discretion to conduct its technical evaluation is not without its limits. *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 443 (2022) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). The technical evaluation "must [still] be consistent with the factors and procedures outlined in the solicitation." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 614 (2020) (citing *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014)).

An agency decision is also arbitrary and capricious when it results from unequal treatment of the offerors. *See CliniComp Int'l Inc. v. United States*, 117 Fed. Cl. 722, 742 (2014) (stating that "unequal treatment is fundamentally arbitrary and capricious, and violates . . . full and open competition"). An offeror is treated unequally when "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). If a protestor can demonstrate that the relevant proposals were substantively indistinguishable, then the court may compare and analyze "the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Id.*

## III.    DISCUSSION

Samsara raises five challenges to the USPS's evaluation and award decision. First, it argues that "Geotab was given a substantial (and impermissible) advantage as a result of [the] USPS's arbitrary and capricious evaluation under Factor 1 of the Solicitation." [ECF 58] at 14.[7] Second, it argues that the USPS's assignment of "a weakness to Samsara's proposal based on Samsara's purported lack of FedRAMP authorization" was arbitrary and capricious. *Id.* at 27. Third, it argues that the "USPS's risk evaluation [was] rife with examples of disparate treatment." *Id.* at 30. Fourth, it argues that the "USPS failed to consider the actual price advantages presented by Samsara's proposal and unreasonably justified award to Geotab." *Id.* at 35. Finally, it argues that "given the cumulative effect of the material improprieties . . . USPS's best value determination [was] irreparably and prejudicially tainted." *Id.* at 38. As explained below, the Court finds that the USPS applied unstated evaluation criteria when it assigned a weakness to Samsara's proposal for failing to have an existing OBDI cable under Factor 1 and when it considered Samsara's lack of an existing OBDI cable as part of its risk assessment. The Court also finds that these errors resulted in a flawed best value determination.

### A.    Samsara's Assertions that the USPS's Factor 1 Evaluation Was Arbitrary and Capricious

Samsara argues that the USPS's evaluation of its OBDI capabilities "under Factor 1 – Telematics Solution was arbitrary and capricious, inconsistent with the solicitation, and contrary to [the] USPS's conflict of interest and unfair competitive advantage mitigation measures." [ECF 58] at 14. It contends that "despite previously recognizing that Geotab's pilot program gave 'Geotab experience that Samsara did not have' and drafting the Solicitation to eliminate this advantage by not requiring any [OBDI] capabilities until 180 days into performance, [the] USPS credited Geotab for its 'head start' and penalized Samsara for failing to meet an unstated requirement." *Id.* at 18. The Court finds that the USPS erred in its evaluation of Samsara's

_____

[7] All page numbers in the parties' briefings refer to the page numbers generated by the CM/ECF system.

proposal by applying an unstated evaluation criterion. However, the USPS did not give Geotab an unfair competitive advantage.

        1.      <u>Samsara's Assertion that the USPS Applied Unstated Evaluation Criteria By Assigning Samsara a Weakness for its Lack of an Existing OBDI Cable</u>

In its evaluation of Samsara's proposal under Factor 1, the USPS assigned it a weakness, stating: "No OBDI cable currently available, though committed to developing. Committed to completing in time for [First Article Testing]." AR 3155. Samsara contends that the assignment of the weakness was arbitrary and capricious "[b]ecause the Solicitation did not require offerors to demonstrate any [OBDI] devices at the time of award." [ECF 58] at 21. Specifically, Samsara argues that the USPS "departed from the terms of the Solicitation and impermissibly faulted Samsara for not having an [OBDI] cable currently available." *Id.* (internal quotation marks omitted). It further argues that "[t]he Solicitation did not require [OBDI] capabilities at the time of award." *Id.* at 18. In support of its argument, Samsara cites the Statement of Work ("SOW"), which required suppliers to "create, modify, or acquire software and hardware compatible with the [LLV] OBDI (1987-1994 Chevrolet S-10 chassis and powertrain) system." *Id.* (quoting AR 1887). Samsara also cites the Questions & Answers ("Q&A"), which provided that the USPS "would expect that suppliers are able to demonstrate their [OBDI] capabilities within the 180-day timeframe between contract award and [First Article Inspection] 3." *Id.* (quoting AR 1934) (emphasis omitted). The government and Geotab contest this characterization, contending that the solicitation and the SOW required suppliers to "show that [they] had the *capability* to develop such a device through pictures and diagrams." [ECF 61] at 37 (emphasis in original); *see also* [ECF 60] at 11 ("Samsara ignores the fact that the Solicitation did require offerors to demonstrate an ability to develop an [OBDI] device by providing 'pictures/diagrams detailing the OBDI form factor connector that correlates to a 1987 Chevrolet S-10.'") (quoting AR 1846).

The Court addressed this argument in its May 26, 2023, opinion and order denying Samsara's motion for preliminary injunction. *See Samsara*, 166 Fed. Cl. at 472. However, since that decision, the government completed the administrative record with additional evaluation materials. [ECF 54]. The completed record reveals that the evaluators penalized Samsara for failing to have an OBDI cable at the time of bid submission, despite the solicitation granting suppliers 180 days to develop and deliver this cable. Accordingly, the Court finds that the USPS applied unstated evaluation criteria when it assigned a weakness to Samsara's proposal for its lack of an existing OBDI cable.[8]

As an initial matter, the solicitation required that the supplier deliver a telematics solution, including an OBDI cable. Section 3.1.1 of the SOW required that the supplier "be able to provide" telematics devices to support "Light Duty OBDI vehicles: the Grumman [LLV] with an OBDI connector specific to a Chevrolet S-10 1987-1994 model years." AR 151. Further, section 3.1.3 listed an "OBDI connector or similar for OBDI vehicles" as a component of the

---

[8] The Court reached a different conclusion in its May 26, 2023, opinion and order denying Samsara's motion for preliminary injunction. However, the additional evidence makes clear that the USPS evaluators assigned Samsara a weakness purely because of its lack of an existing OBDI cable, not because of its proposed approach for satisfying the requirement for an OBDI cable.

telematics solution. *Id.* The SOW Compliance Matrix requested that suppliers "provide pictures/diagrams detailing the OBDI form factor connector that correlates to a 1987 Chevrolet S-10." AR 1846.

The solicitation also required that the supplier's proposed telematics solution undergo First Article Inspection within 180 days of contract award. Section 3.3.1 required that the supplier "furnish one Telematics device for each USPS vehicle type and trailer as first articles for examination and testing to verify that the function of the Telematics system meets the USPS requirements prior to deployment and acceptance of Telematic Devices." AR 167. It further provided that the period for the USPS "to accept, conditionally accept, or deny the first article" device was "180 days after contract award." AR 167-68. Moreover, the Q&A stated that the USPS "expect[ed] suppliers [to be] able to *demonstrate* their OBDI capabilities within the 180-day timeframe between contract award and [First Article Inspection] 3." AR 1934 (emphasis added). The solicitation instructed each supplier to "describe in detail, its proposed solution and why it provides the best solution for achieving the desired results to meet [the] USPS requirements." AR 131.

Considering these stated requirements, the USPS had discretion to assess whether a supplier's proposed telematics solution was capable of satisfying the SOW requirements and to assign strengths and weaknesses based on its assessment. *See Banknote Corp.*, 56 Fed. Cl. at 387 (stating that "it is well-settled that a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors") (internal quotation marks omitted). However, the USPS did not assign Samsara's proposal a weakness because it lacked the ability to meet the SOW requirements, failed to sufficiently describe its proposed telematics solution, or failed to include pictures or diagrams. Instead, the record shows that the evaluators assigned a weakness based solely on Samsara's lack of an existing OBDI cable.

The record includes seven individual evaluator worksheets for each proposal. AR 4301-631. Of the seven evaluators providing comments on Samsara's proposal, five evaluators gave Samsara a weakness for failing to have an OBDI cable under Factor 1. *See* AR 4331 ("No OBDI options"); AR 4363 ("No [OBDI] cable or ability to connect or communicate with [OBDI] vehicle"); AR 4531 ("No OBDI currently available, though committed to developing."); AR 4601 ("3.1.1 OBDI will require development . . . 3.1.11 mentions y-cable for OBDI but response to 3.1.1 states no current OBDI solution"); AR 4633 ("No cable developed for OBDI – 3.1.3 . . . No work done on LLV at all??"). The other two evaluators did not comment on Samsara's lack of an OBDI cable. *See* AR 4469; AR 4562. In the comments of the five evaluators who noted Samsara's failure to have an OBDI cable, the evaluators did not discuss Samsara's capability to develop such a cable but rather simply noted that Samsara did not have one. However, the solicitation did not require that suppliers have an existing OBDI cable upon proposal submission. It allowed suppliers to deliver the OBDI device for First Article Inspection "180 days after contract award." AR 168. By assigning a weakness against Samsara for failing to have an OBDI cable at the time of proposal submission, the USPS applied an unstated evaluation criterion. *See*

*Bluewater*, 150 Fed. Cl. at 614 ("The technical evaluation must [still] be consistent with the factors and procedures outlined in the solicitation.") (internal quotation marks omitted).[9]

        2.    <u>Samsara's Assertion that the USPS Gave Geotab an Unfair Competitive Advantage</u>

Samsara argues that "Geotab won the contract because it had a pre-existing [OBDI] solution designed specifically for the USPS LLVs." [ECF 58] at 22. It contends that Geotab's work on the USPS LLVs was an insurmountable advantage and that "[i]t [was] nonsensical [for the USPS] to implement 'longer timelines for the [OBDI] requirements [to] offset any "head start" advantage that Geotab might have had from its pilot experience,' if the same USPS-funded 'head start' [was] then used as the basis for award." *Id.* at 23-24 (fifth alteration in original) (quoting AR 3748). The Court previously addressed this argument in its decision denying Samsara's motion for preliminary injunction. *See Samsara*, 166 Fed. Cl. at 466-67. For the same reasons, the Court finds that the USPS rationally assessed Geotab's OBDI solution and that the USPS did not provide Geotab with an impermissible advantage.

Samsara's argument is unavailing because it seeks to invalidate an incumbent contractor's inherent advantage. Geotab participated in a pilot program for 600 telematics devices. AR 32. As the Court stated in its prior decision, Geotab's advantages from that pilot program are "similar, if not the same, as those gained by an incumbent contractor bidding on a follow-on contract." *Samsara*, 166 Fed. Cl. at 468. While an agency may not unduly tip the scales in favor of an incumbent contractor, an agency is not required to ignore the benefits or advantages derived from an offeror's incumbency, and it likewise need not attempt to level the playing field for all other offerors. *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391, 398 (2003); *Galen Med. Assocs., Inc. v. United States*, 56 Fed. Cl. 104, 111 (2003) (citations omitted). Although Samsara asserts that "the record evidences that Geotab won the contract because it had an existing [OBDI] device [and that] [t]his result should not have occurred," [ECF 58] at 23, there is no evidence that the USPS impermissibly tipped the scales in favor of Geotab. To the contrary, the record demonstrates that the USPS evaluated Geotab's proposal in accordance with the solicitation.

As explained above, the solicitation contained a requirement for the supplier to demonstrate the ability to deliver a telematics solution, including an OBDI cable. *See supra* Section III.A.1. In its proposal, Geotab demonstrates that it has already developed a telematics device that may be installed into vehicles with OBDI ports. AR 1978, 1980. It also provides pictures of the device connecting to an OBDI vehicle. AR 2001. Based on Geotab's proposed solution, the USPS had a rational basis for viewing Geotab's existing solution as a strength and as providing a benefit to the USPS. The USPS was not required to neutralize the inherent competitive advantage gained by Geotab through its participation in the pilot program. *See*

---

[9] The Court is not persuaded by the government's contention that the evaluator comments "do not support Samsara's assertion because the evaluators commented that Samsara had not demonstrated the required *ability* to develop an OBDI device," [ECF 63] at 11 (citing AR 4363). In support of its argument, the government cites the comments of only one evaluator, who stated, under Factor 1, that Samsara lacked both the OBDI cable and the ability to connect or communicate with an OBDI vehicle. AR 4363. In short, even that evaluator applied an unstated evaluation criterion by requiring Samsara to have an OBDI cable at the time of proposal submission.

*WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998); *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 (2007) ("Decisions of this court . . . emphasiz[e] that the government need not forgo the benefits of incumbency in ensuring a level playing field."). Moreover, the record shows that the USPS assigned strengths to other suppliers besides Geotab for their existing OBDI solutions. *See* AR 3179 (assigning a strength to [* * *] for its "patented technology for OBDI connector"); AR 3182 (assigning a strength to [* * *] for its "[a]bility to transmit and interpret OBDI ALDL codes from a Chevy S-10 on simulated USPS routes").[10] Thus, Geotab was not the only bidder to receive a strength for its proposed OBDI solution. Accordingly, the USPS did not improperly credit Geotab's existing OBDI solution under the solicitation.[11]

**B.     Samsara's Assertion that the USPS Applied Unstated Evaluation Criteria and Engaged in Disparate Treatment By Assigning Samsara a Weakness for its Lack of FedRAMP Authorization**

Samsara argues that the "USPS's assignment of a weakness to Samsara's proposal based on a purported lack of FedRAMP authorization at the time of award was arbitrary, capricious, and disparate." [ECF 58] at 27. This argument is largely the same as its previous argument, which the Court addressed in its decision denying Samsara's motion for a preliminary injunction. *See Samsara*, 166 Fed. Cl. at 474. In its instant motion, Samsara argues that the USPS's assignment of a weakness amounts to the application of unstated evaluation criteria because the solicitation did not require suppliers to "demonstrate FedRAMP authorization at the time of award." [ECF 58] at 27. Samsara also argues that the USPS treated its proposal disparately with respect to FedRAMP authorization status. *Id.* at 28-29. The Court finds that the USPS rationally assigned Samsara's proposal a weakness because it failed to address each of the requirements in Section 3.2.8 of the SOW.

Section 3.2.8 contained the following cloud security and FedRAMP requirements:

> In support of a solution hosted in a Cloud Service Provider's (CSP's) cloud, the Supplier must have:
>
> A.     A FedRAMP Authorization to Operate is Mandatory for Postal Service Platform as a Service (PaaS) and Infrastructure as a Service (IaaS) cloud deployments and

---

[10] [* * *] received the same technical score as Geotab under Factor 1.1, Device Capabilities and Component. AR 3195.

[11] In a footnote to the Court's May 26, 2023, opinion and order denying Samsara's motion for a preliminary injunction, the Court stated that "Samsara is not likely to succeed with [its unfair competitive advantage] argument [] because it waived the ability to raise it" under the Blue & Gold waiver rule. *Samsara, Inc.,* 166 Fed. Cl. at 468 n.7. In its instant motion, Samsara contends that the *Blue & Gold* waiver rule does not apply to its argument that the USPS "failed to rationally do what [the] USPS committed to doing in the Solicitation and its mitigation approach." [ECF 58] at 24 n.4. The Court does not address this argument because, even if the *Blue & Gold* waiver rule did not apply to Samsara's argument, the Court finds that the USPS did not improperly credit Geotab for its prior work on the telematics device pilot program.

service models at the low-, moderate-, and high-impact levels, as determined by USPS CISO.

B.      The Supplier is responsible to provide status of FedRAMP authorization i.e., Final (provide FedRAMP ID), in Progress (provide FedRAMP ID), FedRAMP Ready (provide FedRAMP ID or indicate a Not Started. The Provider must provide the FedRAMP ID allowing the Postal Service to collect FedRAMP documents from Max.gov for PaaS and IaaS.

C.      In support of the USPS certification and accreditation process, the Supplier must create, maintain, and update security documentation using FedRAMP requirements and templates, which are available at http://FedRAMP.gov.

D.      An Assessment and Authorization (A&A) Package is required for a SaaS environment that is not FedRAMP Authorized. The Postal Service does not require a FedRAMP Authorization for Software as a Service (SaaS) environments. SaaS will be reviewed using the USPS driven process of the AS 805 Certification and Accreditation.

AR 1889. The SOW compliance matrix advised suppliers to provide "FedRamp Authorization Documentation, SOC II Type II documentation, or related security information for USPS review." AR 1851. During the Q&A period, the USPS stated that "[i]n regard to Section 3.2.8, Suppliers are to demonstrate ability to comply with A, B, C and D" and that "[t]he [USPS] will consider potential suppliers' FedRAMP Packages in its [Certification and Accreditation] process, if available." AR 1933. In response to a question about a subcontractor's FedRAMP certification requirements, the USPS responded with the following:

All cloud solutions must demonstrate the ability to meet Postal Service security requirements. Cloud providers must comply with FISMA Low, Moderate and/or High C&A security controls and process. A FedRAMP Authorization to operate is mandatory for Postal Service Platform as a Service (PaaS) and Infrastructure as a Service (IaaS) cloud deployments and service models . . . *The SaaS must operate on a FedRAMP Authorized PaaS and IaaS deployment* – whether the prime or sub-contractor provides the deployment is immaterial. To be clear, the imperative is *the SaaS must be operated on a FedRAMP Authorized PaaS and IaaS deployment*.

*Id.* (emphases added). In other words, a supplier must account for three types of services: SaaS, PaaS, and IaaS.

Samsara's proposal broadly stated that "Samsara complies with this requirement." AR 2722. It also stated: "Samsara's security leadership is composed of industry veterans, all of which have extensive experience with operating cloud security and compliance programs responsible for adhering to and demonstrating performance against a variety of federal and agency level frameworks, such as FedRAMP," among others. *Id.* Samsara also attached a copy of its SOC II Type II report. AR 2967.

Samsara asserts that its proposed SaaS solution did not need to be FedRAMP authorized. [ECF 58] at 27. Samsara relies on Section 3.2.8 of the SOW, which states: "An Assessment and Authorization (A&A) is required for a SaaS environment that is not FedRAMP Authorized. The Postal Service does not require a FedRAMP Authorization for Software as a Service (SaaS) environments. SaaS will be reviewed using the USPS driven process of the AS 805 Certification and Accreditation." AR 1889. Samsara argues that, because it proposed a SaaS environment, its solution did not need to be FedRAMP authorized. [ECF 58] at 27. Further, Samsara contends that its SaaS solution had already completed the USPS A&A process as required by Section 3.2.8. *Id.* However, in its proposal response, Samsara did not state that it was relying exclusively on a SaaS solution, such that FedRAMP authorization as required for PaaS and IaaS was not necessary, nor did it state that its SaaS solution had already completed the USPS A&A process. *See* AR 2722. Therefore, the USPS's assessment of a weakness against Samsara's proposal because it lacked FedRAMP authorization was rationally based on the stated solicitation requirements. *See Harmonia Holdings Grp., LLC v. United States*, 136 Fed. Cl. 298, 308 (2018) ("The offeror bears the burden of presenting an adequately written proposal that satisfies the requirements of the solicitation.") (quoting *Mercom, Inc. v. United States*, 131 Fed. Cl. 32, 40 (2017) (internal quotation marks omitted)).

Samsara also contends that "the fact that other offerors possessed FedRAMP authorization does not provide any basis for assigning Samsara a weakness." [ECF 58] at 28. According to Samsara, "[t]o the extent [the] USPS thought FedRAMP authorization provided a benefit, the proper approach was to assign [a] strength to other offerors for that benefit, not downgrade Samsara's approach." *Id.* This argument is unavailing because the solicitation required FedRAMP authorization. Although Samsara characterizes the USPS's evaluation approach as applying unstated evaluation criteria, *see id.*, the Q&A stated that "the SaaS must be operated on a FedRAMP Authorized PaaS and IaaS deployment." AR 1933. Samsara's proposal failed to address this requirement. Moreover, while the USPS Chief Information Security Officer ("CISO") recognized that Samsara's "SaaS would be authorized by [the USPS] under [the] AS 805 A&A process," the CISO also noted that an "[e]xception to [the] policy for the lack of FedRAMP Authorization at IaaS/PaaS would need to be completed." AR 4701. Accordingly, the USPS did not apply unstated evaluation criteria in its assessment of a weakness for Samsara's lack of FedRAMP authorization. *See Wellpoint*, 144 Fed. Cl. at 404 (2019) (An offeror must show the agency "used a significantly different basis in evaluating the proposals than was disclosed.").

Samsara further argues that although the USPS penalized it for lacking FedRAMP authorization, the USPS "awarded [* * *] a strength for being '[w]illing to become FedRAMP certified at the SaaS level, and utiliz[ing] [Amazon Web Services ("AWS")] which is FedRAMP certified.'" [ECF 58] at 29 (third alteration added) (quoting AR 3182). Samsara states that it also

utilized AWS and was willing to become FedRAMP certified at the SaaS level. *Id.* These disparate treatment arguments are unpersuasive because [* * *]'s proposed FedRAMP capabilities are substantively distinguishable from Samsara's. In its response to the SOW compliance matrix, [* * *] stated that its platform would be "hosted in a FedRAMP certified AWS region." AR 2557. [* * *] also explained that although the status of its platform was "not started," it would "commit to completing FedRAMP certification if required by [the] USPS." *Id.* The USPS assigned [* * *] the following strength: "Willing to become FedRAMP certified at the SaaS level[] and utilizes AWS which is FedRAMP certified." AR 3183. The USPS therefore had a rational basis for assigning this strength—[* * *]'s proposal.

Samsara's proposed FedRAMP capabilities were substantively distinguishable because Samsara did not specify that it was using a FedRAMP certified AWS region and made no commitment to become FedRAMP certified. *Compare* AR 2557, *with* AR 2722. Samsara asserts that the "USPS was also aware that Samsara was willing to become FedRAMP certified and knew the significant certifications of the AWS platform Samsara was relying on." [ECF 62] at 23 (citing AR 3184). Yet, Samsara's citation to the record refers to the AWS platform's certifications but not to Samsara's willingness to become FedRAMP certified. Moreover, none of Samsara's references to its use of AWS refer to FedRAMP. *See, e.g.*, AR 2977 ("The infrastructure is hosted entirely on Amazon Web Services (AWS)."); AR 2978 ("The production information systems are located at facilities hosted by AWS."); AR 2979 (describing AWS production applications hosted on AWS); AR 2982-83 (describing control activities expected to be implemented by AWS). Further, the control activities associated with AWS do not mention FedRAMP. *See* AR 3009-15 (describing types of control activities but not mentioning FedRAMP). In short, unlike [* * *], Samsara did not mention its willingness to become FedRAMP certified nor reference FedRAMP in relation to its use of AWS in its technical proposal. *Compare* AR 2557 ("The USPS dedicated deployment of the [* * *] Platform will be hosted in a FedRamp certified AWS region.") *with* AR 2722 (no discussion of AWS and its FedRAMP certification) *and* AR 2977 (describing Samsara's "Connected Operations Cloud" but lacking any reference to FedRAMP). Therefore, the USPS did not act unreasonably by assigning [* * *] a strength and by downgrading Samsara's proposal. *See Off. Design Grp.*, 951 F.3d at 1372.

Lastly, Samsara states that "to be clear, all of the AWS services Samsara proposed to rely on are FedRAMP certified." [ECF 62] at 23 (citing AWS's website). However, Samsara did not state this capability in its proposal. Because the burden falls on Samsara "to state its capabilities *in its proposal*, the adverse consequences of an omission are properly [Samsara's] responsibility." *Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 352 (2013) (emphasis in original). While Samsara suggests that the USPS should have inferred that AWS is FedRAMP certified, the Court does not agree. "It is axiomatic that [o]fferors carry the burden of presenting an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 490 (2022) (internal quotation marks and citations omitted). The record demonstrates that Samsara did not meet this burden.

**C.      Samsara's Assertion that the USPS Disparately Treated Offerors when Conducting its Risk Evaluation**

Samsara contends that the USPS's assignment of "Moderate Risk" to its proposal is "unsupportable by the record and specific aspects of offerors' proposals," and that the USPS's assignment of "Low Risk" to Geotab's proposal was "neither warranted nor reasonable." [ECF 58] at 31. According to Samsara, Geotab's "Low Risk" rating is not supported by the record, wherein the USPS found that Geotab's proposal contained nine distinct risks. *Id.* Samsara also asserts that "Geotab's [* * *] presents numerous risks that [the] USPS failed to consider," namely that "[* * *]," and that "Geotab's reliance on [* * *]." *Id.* at 32. Additionally, Samsara asserts that the USPS unreasonably "found that an Offshore Exception would apply to Samsara because . . . Samsara may access USPS data from non-US locations." *Id.* at 34. The Court finds that the USPS's assignment of "Moderate Risk" to Samsara's proposal was arbitrary and capricious but that its assignment of "Low Risk" to Geotab's proposal was rational.

The solicitation informed offerors as follows: "Evaluators will examine the Offeror's ability to comply with the requirements of the SOW through written evaluations . . . Evaluation Criteria will be based on an 'Adjectival' scoring methodology. Adjectival scoring will consider Strengths, Weaknesses, and Risks of each evaluation criteria." AR 137. The USPS considered each offeror's proposal and past performance record to determine whether there would be little or no doubt, some doubt, or substantial doubt in the offeror's ability to successfully perform the required effort. AR 42. The USPS assessed the overall risk of offerors using a ten-point scale. AR 42. The USPS awarded offerors with a high level of risk zero points, offerors with a medium level of risk five points, and offerors with a low level of risk ten points. *Id.*

Applying this scale, the USPS assigned Geotab ten points for overall risk. AR 3097. In total, it assigned Geotab sixty-nine strengths, six weaknesses, and nine risks. AR 3175-77. In its narrative regarding Geotab's risk score, the USPS stated the following:

> Geotab has experience with similar fleets and is a clear industry leader in telematics. Existing partnerships with FMIS, EVSE, and OEM providers significantly reduces integration risks. Experience with other federal fleets, and other large delivery fleets, suggests familiarity with USPS use case to the extent possible. Robust integration and rollout plans and support infrastructure in place. D&B gives risk score of 1 (lowest possible). Existing FedRAMP authorization. Excellent examples for accident reconstruction (many suppliers only reference accident impact, not reconstruction).

AR 3187.

The USPS assigned Samsara five points for overall risk. It assigned Samsara thirty-four strengths, nine weaknesses, and seven risks. AR 3184-86. In its narrative regarding Samsara's risk score, the USPS stated the following:

> Samsara is an established supplier and offers multiple devices today. Strong past experience and integrations with FMIS suppliers are a plus. However, they do not provide existing OBDI capabilities and would need to develop a cable to connect to the vehicle. Audible alerts also must be developed. The larger form factor device will limit the ability to place/hide the device in some vehicle types.

AR 3188.

The Court finds that the USPS's assessment of Samsara's overall risk is flawed because it is partly based upon Samsara's lack of an existing OBDI cable. In its explanation of Samsara's score, the USPS stated that Samsara does not "provide existing OBDI capabilities and would need to develop a cable to connect to the vehicle." AR 3188. Although the solicitation informed offerors that the USPS would assess their capability to develop the OBDI cable, it did not require them to have an existing cable at the time of proposal submission. *See supra* Section III.A.1. Therefore, the USPS's justification for Samsara's risk rating is arbitrary because it was partly based upon an unstated evaluation criterion. *See CliniComp*, 117 Fed. Cl. at 742 (stating that an agency "must provide a 'coherent and reasonable explanation for its conclusions'") (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)).

Samsara's remaining arguments are uncompelling. First, its challenge to the USPS's assessment of Geotab's risk is unavailing because the number of risks and the agency's assessment of those risks are within the agency's discretion. Samsara argues that the USPS's assignment of nine distinct risk findings to Geotab's proposal cannot warrant a "Low Risk" rating. [ECF 58] at 31-32. This argument fails because an agency's decision to assign one offeror a different number of risks than another is an insufficient reason for this Court to set aside an agency's technical evaluation. *See McConnell Jones Lanier & Murphy LLP v. United States,* 128 Fed. Cl. 218, 230 (2016) ("[A] simple comparison of the number of strengths or weaknesses identified in each proposal could not reasonably serve as the basis for determining either their adjectival ratings or relative value."). The USPS rationally found that the overall merit of Geotab's proposal amounted to a "Low Risk" rating. AR 3187 ("Existing partnerships with FMIS, EVSE, and OEM providers significantly reduces integration risks. Experience with other federal fleets, and other large delivery fleets, suggests familiarity with USPS use case to the extent possible. Robust integration and rollout plan[] and support infrastructure in place. D&B gives risk score of 1 (lowest possible)."). Although Samsara received fewer risks than Geotab, the USPS had the discretion to weigh those risks. *See McConnell Jones*, 128 Fed. Cl. at 230 ("[A]bsent a facial conflict between the adjectival ratings assigned and the narrative justifications the agency provided (or some other dramatic internal inconsistency), the Court must grant great deference to the decisions of agency experts as to whether a particular proposal's strengths and weaknesses support a 'very good' rather than 'satisfactory' rating, or an 'exceptional' rather than 'very good' rating."); *E.W. Bliss Co.*, 77 F.3d at 449 (stating that technical ratings "involve discretionary determinations of procurement officials that a court will not second guess") (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993)). Because the Court must "give the greatest deference possible" to the USPS's technical determinations, the Court will not second guess the USPS's assignment of a "Low Risk" rating to Geotab. *McConnell Jones*, 128 Fed. Cl. at 230.

15

Next, the Court is not persuaded by Samsara's argument that the USPS's list of risk findings for Geotab's proposal is incomplete because the USPS entirely disregarded the fact that [* * *]. *See* [ECF 58] at 32. Samsara contends that "[w]hereas [the] USPS penalized Samsara for the fact that it did 'not provide existing OBDI capabilities and would need to develop a cable to connect to the vehicle,' [the] USPS undertook no consideration of the fact that Geotab [* * *]." *Id.* Samsara asserts that Geotab's demonstration with the USPS revealed [* * *]. (citing AR 4258 at 44:37-44:44).[12] The record does not support this argument. Geotab offered a complete [* * *], proposing the use of an "[* * *]." AR 1976. Further, as Geotab indicated in its briefing (and Samsara did not contest in its reply brief), the quotation Samsara relies on refers to the "[* * *]" rather than the [* * *]. [ECF 60] at 23; [ECF 62] at 24-26. Thus, the USPS did not unreasonably downgrade Samsara's proposal "for deficiencies that were 'substantively indistinguishable' or nearly identical" from Geotab's proposal. *See Off. Design Grp.*, 951 F.3d at 1372. Rather, Geotab's proposed [* * *] and Samsara's lack of an OBDI cable are clearly distinguishable elements of each supplier's proposal. Accordingly, the USPS did not engage in disparate treatment when assessing these elements of Geotab's and Samsara's respective proposals.

Samsara's argument that Geotab's [* * *] does not meet the solicitation requirements and should have been assessed as a risk is similarly uncompelling. *See* [ECF 58] at 32-33. For this challenge, Samsara relies on an exchange in the Q&A in which the offeror asked whether the "USPS require[s] data from vehicles and trailers to be natively hosted in the same dashboard[,]" and the USPS responded as follows: "Yes. Data from all Telematics devices installed on vehicles and trailers should be visible on the same dashboard." AR 1954. Samsara argues that "[* * *]." [ECF 58] at 33. Further, it argues that "because Geotab's proposal requires use of [* * *], any blanket determination that Geotab is fully FedRAMP authorized is unreasonable." *Id.* This challenge is unpersuasive because Samsara does not identify a solicitation requirement that mandates that *all* data be "natively hosted" in a single dashboard, and Samsara mischaracterizes the USPS's Q&A response. While the USPS responded affirmatively that the USPS requires data from [* * *] to be natively hosted in the same dashboard, it qualified its response by adding that the data should be "visible on the same dashboard." AR 1954. In this regard, Geotab's proposal states the following:

[* * *]

. . .

[* * *]

AR 1976. It also provides that "[* * *]" and that its "[* * *] is [* * *]." *Id.* Based on the record, the Court defers to the USPS's decision to not assign a risk to Geotab's proposal for [* * *].[13] *See McConnell Jones*, 128 Fed. Cl. at 230.

---

[12] Samsara incorrectly cites to AR 4258 for Geotab's demonstration. The correct citation is AR 4283.

[13] In its response to this argument, the government states that "during Geotab's demonstration, it [* * *]." [ECF 61] at 48. Therefore, the government asserts that the data "would be viewable and assessable from a single interface." *Id.* The government cites to AR 4283, which contains an invitation to watch the recording of Geotab's

Finally, Samsara's argument that the USPS erred in finding that it would require an offshore exception fails because the USPS's finding is supported by the record. The USPS information security policy states that "viewing, processing, transmitting, or storing USPS data is not permitted outside the U.S." AR 3194. The solicitation required suppliers to agree to Clause 1-1: Privacy Protection, which provides that "[t]he supplier may not maintain, access, or store (including archival back-ups) any Personal Information outside the United States." AR 78-79. In response to a USPS question, Samsara requested "[* * *]." AR 4236. Samsara stated that it "will provide help desk support only from the United States," but "[* * *]." *Id.* Samsara further specified that its personnel will primarily access "Postal Service Personal Information data . . . from the United States, but [* * *]." *Id.* Additionally, Samsara stated that it "could agree to limit such access if that is a requirement for [the] USPS, but [that] a limitation to U.S.-only access and use could extend development and maintenance timeframes." *Id.* The USPS concluded that because Samsara may access USPS data outside of the United States, an "Offshore Exception would apply to Samsara," which would "negatively impact [Samsara's] deployment schedule as the program office must get the exception approved." AR 3194. The Court finds that the USPS's assignment of a weakness was rational because Samsara did not agree to the privacy protection clause and instead requested a deviation. AR 4236. Based on Samsara's response, the USPS rationally determined that Samsara may require an Offshore Exception and that such an exception would negatively impact the deployment schedule.

### D. Samsara's Assertion that the USPS Failed to Conduct an Equal Price Evaluation

Samsara argues that the USPS failed to conduct a level price evaluation as required by the USPS's Supplying Principles and Practices ("SP&P").[14] [ECF 58] at 37. Section 2-34.1 of the SP&P provides:

> When evaluating potential suppliers' proposals, the pricing analyst should compare not only the price, but also the terms and conditions of the proposal. Often, these terms and conditions will differ with regard to delivery schedule and upgraded technology to the point that a direct comparison between proposals cannot be made. *Therefore, the pricing analyst must "level" the proposals to meet the basic requirements of the RFP to ensure that the price*

---

demonstration. While the Court was not able to access the recording to confirm the government's explanation, Samsara does not challenge the government's reliance on the demonstration. *See* [ECF 62] at 24-25.

[14] USPS procurements are exempt from the requirements of the Federal Acquisition Regulation ("FAR") and the Competition in Contracting Act. 39 U.S.C. § 410. Instead, the USPS's Purchasing Regulations "apply to all Postal Service acquisition of property (except real property) and services." 39 C.F.R. § 601.103; *see also Banknote Corp.*, 365 F.3d at 1349 n.1 (stating that the predecessor to the Purchasing Regulations, "not the [FAR], applies to USPS procurements."). The USPS developed the SP&P to "supplement the Postal Service's purchasing regulations." U.S. Postal Serv. Supplying Principles and Practices, Introduction. The SP&P, however, "are not binding regulations of the Postal Service." SP&P, General Overview of the U.S Post. Serv. Supplying Principles. While the USPS SP&P do not constitute binding regulations, the Court may review whether the USPS's actions lacked a rational basis considering the SP&P. *See Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 266 (2021) (citing *Impresa*, 564 F.3d at 1332).

> *evaluation is performed on proposals with comparable terms and conditions.* This may be accomplished by removing additional or upgraded services or components from the overall proposal and proposed price so that the price evaluation can be made only with regard to the terms and conditions explicitly stated in the RFP.

SP&P 2-34.1 (emphasis added).

Reasserting an argument from its earlier motion for a preliminary injunction, Samsara contends that the USPS "failed to calculate or consider" the difference between Samsara's proposed flat pricing and Geotab's "significant options and fees." [ECF 58] at 36. Samsara argues that, since the Court's decision denying Samsara's previous motion, the "USPS did not produce any documents demonstrating whether and how the USPS factored [the] remote/rural pricing fees into its evaluation of Geotab's price." *Id.* at 37. Samsara thus argues that "[w]ithout any contemporaneous evaluation record, neither the Government nor this Court [has] any basis to conclude that . . . [the] USPS would necessarily reach the same award decision . . . because the record here provides no basis for this Court to reach such a conclusion without making a finding of fact that [the] USPS never made." *Id.* As explained below, the Court finds that the USPS conducted an equal price evaluation in compliance with its SP&P.

Samsara's argument that the USPS failed to consider significant options and fees contained in Geotab's proposal is not supported by the record. For example, Samsara states that Geotab's pricing did not include the cost of an Original Equipment Manufacturer ("OEM") data feed or waterproof versions of its devices, which would have added $[* * *] per device. [ECF 58] at 36 (citing AR 4251-53). However, the record demonstrates that the USPS included fees for options such as Bluetooth functionality, seat belt and reverse data, and fuel data, from Geotab's pricing proposal to meet the SOW requirements, as required to "level" the proposals for pricing purposes consistent with the SP&P. *See* AR 3168-69. Further, Samsara does not demonstrate that an OEM data feed or a waterproof version of the devices were requirements under the SOW, such that the USPS should have added these options for pricing purposes.

Next, Samsara's argument that the USPS failed to factor in the remote/rural installation travel fees referenced in Geotab's proposal fails because the record shows that the USPS conducted a level price evaluation relating to travel costs. While the USPS has not produced documents showing how it treated Geotab's travel fees, this lack of documentation alone does not support a finding of unequal pricing. That is because the record shows that both Geotab and Samsara included a contingency for travel fees in their respective proposals. *See, e.g.*, AR 3337 (Geotab's proposal states that "additional travel fees may apply for remote/rural installations."); AR 3096 (Samsara's proposal states that the "USPS can save money by contracting directly with Samsara's trusted install partners at a rate of $[* * *]/vehicle for installation + travel cost."). Although the record does not indicate that the USPS incorporated the potential additional travel cost for either Geotab or Samsara into its price evaluation, *see* AR 3193, this does not result in unequal pricing or otherwise violate the SP&P. Rather, the SP&P recognizes that a direct comparison between proposals often cannot be made and allows the USPS to remove costs from proposed prices to ensure level pricing. Here, the USPS applied the same installation costs for Geotab and Samsara, irrespective of their contingencies for potential travel costs. *Id.*

Finally, the Court is not persuaded by Samsara's assertion that the USPS failed to equally evaluate Geotab's and Samsara's installation fees, contending that Geotab's fees will apply "regardless of whether Geotab or [the] USPS performs the installation." [ECF 58] at 36 (emphasis removed). The record states otherwise. Regarding Geotab's $[* * *] fee for telematics device installation, Geotab states: "[A]dditional travel fees may apply for remote/rural installations. This fee will apply to *no-show installations* as well." AR 4253 (emphasis added). In other words, Geotab explains that if it is required to install the telematics device, it will charge the USPS $[* * *], even if the agency is not present for the installation. Contrary to Samsara's contention, Geotab does not indicate that it will charge $[* * *] in instances where the USPS is performing the installation. Thus, Samsara's suggestion that Geotab's price must be increased to account for additional USPS installations is not supported by the record.

### E.       Samsara's Assertion that it was Prejudiced by the USPS's Errors

Having found that the USPS acted arbitrarily in evaluating Samsara's proposal, the Court must determine whether Samsara was prejudiced by the USPS's errors. *See Bannum*, 404 F.3d at 1351 (stating that once a court finds that an agency acted arbitrarily, the court "proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct"). For Samsara to prevail, it "must show prejudicial error." *Glenn Def. Marine (Asia), PTE, Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013). There is no presumption of prejudice upon a showing that an agency acted irrationally. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). To establish prejudice, Samsara must show that "but for the alleged error, there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).

Samsara argues that "given the cumulative effect of the material improprieties . . . [the] USPS's best value determination [was] irreparably and prejudicially tainted." [ECF 58] at 38. Specifically, it asserts that the "USPS's myriad errors in evaluating Samsara's and Geotab's technical and price proposals[] and [the] USPS's unreasonable and unequal risk assessment contributed to a fundamentally flawed best value award decision." *Id.* at 39. The Court finds that Samsara was prejudiced by the USPS's errors and that such errors resulted in a flawed best value determination. *See BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 694 (2012) (citing *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 767 (2008) (holding that a tradeoff analysis based on significant flawed evaluation ratings is itself irrational)).

The solicitation stated that "the contract award decision will be based on 'Best Value'" and that the "[a]ward will be made to the capable Offeror who submits the best combination of Technical and Price Proposals." AR 136. The combination of technical and price proposals will "be assessed relative to a tradeoff between technical merit and price to determine best value." *Id.* In making the best value determination, "technical factors are considered more important than price." *Id.* (emphasis omitted). Further, as the ratings for the technical factors become more equivalent, price will become an increasingly significant factor in the best value decision. *Id.* The solicitation stated that the USPS anticipated awarding "one or more firm-fixed price Indefinite Delivery Indefinite Quality (IDIQ) contracts to one or more supplier(s)." AR 55.

The Court determined that the USPS erred in its technical evaluation by assigning a weakness to Samsara's proposal for its lack of an existing OBDI cable, *see supra* Section III.A.1, and in its risk evaluation by considering Samsara's lack of an existing OBDI cable in assigning a "Moderate Risk" rating, *see supra* Section III.C. Following the USPS's technical evaluation, Geotab received a score of 85.5 (the highest score), and Samsara and [* * *] received scores of 78.0 (the second highest scores). AR 3195. Following the USPS's risk evaluation, Geotab received a score of 10 (the highest score), and Samsara and [* * *] received scores of 5 (the second highest scores). *Id*. But for the USPS's errors in evaluating Samsara's proposal, it is possible that Samsara would have received higher scores under the technical and risk evaluations, possibly scores closer to those of Geotab, thereby rendering Samsara's lower proposed price more significant in the USPS's best value determination. Thus, Samsara has met its burden of showing that, but for the USPS's errors, there was a substantial chance that it would have received an award. Whether Samsara's proposal warrants a higher technical and risk score and whether the resulting score from the reevaluation of Samsara's proposal impacts the best value trade-off are determinations properly left to the USPS. *See FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 397 (2011) (stating that the assignment of technical ratings is a matter that is "within the broad discretion of the procuring agency") (citing *E.W. Bliss Co.*, 77 F.3d at 449).

### F.      Samsara's Entitlement to Injunctive Relief

Samsara requests that the Court grant "a combination of (1) remand; (2) declaratory relief; and (3) permanent injunctive relief." [ECF 58] at 40. Under the Tucker Act's plain language, "in an action pursuant to 28 U.S.C. § 1491(b), this Court may issue at least three types of nonmonetary, equitable relief orders (or a combination thereof); specifically, this Court may: (1) remand a matter to an agency for further consideration; (2) issue declaratory relief; and/or (3) issue injunctive relief." *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 65-66 (2022). Regardless of the form of equitable or declaratory relief, "as a precondition for vacating an agency's contract award or issuing a similarly coercive order, this Court must apply the standard injunctive relief factors." *Id.* at 70. To determine whether to issue a permanent injunction, the court must consider (1) whether the plaintiff succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm without injunctive relief; (3) whether the balance of hardships favors granting injunctive relief; and (4) whether the public interest is served by a grant of injunctive relief. *See Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)). Samsara has succeeded on the merits, so the Court must now consider whether Samsara will suffer irreparable harm without injunctive relief, whether the balance of hardships favors granting an injunction, and whether the public interest is served by an injunction.

The Court finds that Samsara is entitled to injunctive relief because Samsara has succeeded on the merits of its claim and the remaining injunctive relief factors weigh in favor of granting relief. *See Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 353 (2012) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing *PGBA*, 389 F.3d at 1228-29). First, Samsara will suffer irreparable harm without

injunctive relief because there is no adequate alternative remedy for its lost opportunity to fairly compete for the contract. *See Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 582 (2013) (highlighting that "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction") (alteration in original); *Sys. Stud. & Simulation, Inc. v. United States*, 146 Fed. Cl. 186, 203 (2019) ("The United States Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract."). Second, the balance of hardships weighs in favor of Samsara. Although the government contends that "[a]ny delay in the Telematics program will have a direct impact on the broader ongoing modernization initiatives being implemented at the Postal Service," [ECF 61] at 55, this Court has recognized that "only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests," *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 495 (2013) (alteration in original) (quoting *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006)). Here, the government's argument is unconvincing because the delay and administrative burdens associated with stopping performance under the current award and requiring the agency to take curative actions are problems of the government's own making. *Serco Inc. v. United States*, 81 Fed. Cl. 463, 503 (2008). Finally, the public interest weighs in Samsara's favor because "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003); *see also Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 519 (2018).

## IV.   CONCLUSION

For the foregoing reasons, Samsara's motion for judgment on the administrative record [ECF 58] is **GRANTED**, and the government's cross-motion [ECF 61] is **DENIED**.

Samsara is entitled to injunctive relief. The Court **ENJOINS** the USPS from proceeding with performance of the contract awarded to Geotab pursuant to the solicitation. The Court **ORDERS** the USPS to reevaluate Samsara's proposal in a manner that redresses the errors identified in this Opinion, to conduct a new best value trade-off determination, and, as necessary, to make a new award decision.

Some information contained in this Opinion may be considered protected information subject to the Protective Order entered on March 20, 2023. [ECF 13]. Accordingly, the Opinion is filed **UNDER SEAL**. The parties **SHALL CONFER** and **FILE**, **on or before January 18, 2024**, a joint status report that identifies any information the parties contend should be redacted, explains the basis for each proposed redaction, and includes an attachment of the proposed redactions for this Opinion.

The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge